(No. 88799.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES MUNSON, Appellant.

*Opinion filed June 20, 2002.—Rehearing denied August 29, 2002.*

HARRISON, C.J., and KILBRIDE, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Kathryn Saltmarsh, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant, and James Munson, of Pontiac, appellant *pro se.*

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, James Munson, was convicted of the first degree murder of Marvin Cheeks, armed robbery, aggravated kidnapping, and arson of the property of Cheeks. Defendant waived a jury for sentencing and, following a bifurcated sentencing hearing, was sentenced to death by the trial court on the first degree murder conviction and to concurrent prison terms on the other convictions. The trial court denied defendant's post-trial motions. This court affirmed defendant's convictions and death sentence on direct appeal (*People v. Munson*, 171 Ill. 2d 158 (1996)), and the United States Supreme Court denied *certiorari* (*Munson v. Illinois*, 519 U.S. 880, 136 L. Ed. 2d 141, 117 S. Ct. 205 (1996)). Defendant filed a post-

conviction petition, which was dismissed by the trial court on the State's motion. Defendant's appeal lies directly to this court. 134 Ill. 2d R. 651(a).

## BACKGROUND

The facts of this case are set forth in this court's opinion on direct review and will be repeated here only as necessary to address defendant's arguments in this appeal. In December 1995, defendant filed a *pro se* petition for post-conviction relief and requested appointment of counsel. Post-conviction counsel filed an amended post-conviction petition and a supplement to the petition. Defendant filed a *pro se* supplemental petition. The various petitions made many allegations, some of which have been abandoned in this appeal. The amended post-conviction petition advanced five claims for relief: (1) trial counsel was ineffective in failing to properly investigate and present mitigating evidence at the capital sentencing hearing; (2) defendant was denied equal protection or, in the alternative, effective assistance of appellate counsel, regarding a failure to raise a challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), to the State's use of a peremptory challenge to venireperson Sandra McElwee; (3) appellate counsel was ineffective for failing to raise the issue of prosecutorial misconduct; (4) defendant was denied due process when the trial court erroneously found defendant's possession of a handgun when he was arrested to be an aggravating factor at sentencing, or in the alternative, trial counsel was ineffective for failing to produce police reports that would have corroborated defendant's claim as to his intent in possessing the gun; and (5) defendant's sentence is unconstitutionally disparate to that of his codefendant, Darryl Clemons.

Post-conviction counsel further alleged in the supplement to the post-conviction petition that (1) defendant's arrest was illegal; (2) trial counsel was ineffective for (a)

failing to investigate and present independent ballistics testing and forensic analysis of the alleged murder weapon, (b) failing to file motions to quash defendant's arrest and adequately prepare for the suppression motion counsel did file, (c) failing to present any defense evidence or a coherent theory of defense at trial, and (d) presenting a "rambling[,] incoherent[,] offensive" closing argument that conceded defendant's guilt and attacked the victim; (3) appellate counsel was ineffective for (a) not obtaining portions of the record relating to *Batson* discussions concerning juror McElwee and the availability of Kenneth Burks as a witness, (b) failing to raise the admissibility of the recovered weapon, (c) failing to raise the trial court's improper restriction of cross-examination regarding a witness' expectation of a reward, and (c) failing to raise the issue of disproportionality of defendant's sentence; (4) the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) in failing to disclose criminal records of certain witnesses and the existence of a reward offered by the victim's family for information leading to the victim's killer; (5) the State presented perjured testimony or failed to correct testimony it knew to be false of two witnesses; (6) defendant's constitutional rights were violated where the prosecutor (a) repeatedly commented in closing argument on defendant's failure to testify at trial, and (b) made repeated improper statements in closing argument; and (7) defendant's constitutional rights were violated where he did not knowingly and intelligently waive his right to a sentencing jury due to trial counsel's misinforming and actively misleading him.

The trial court granted the State's motion to dismiss, finding defendant's claims to be barred by waiver and *res judicata*.

## ANALYSIS

### I. Standard of Review

The Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 2000)) provides a remedy by which defendants may challenge their convictions or sentences for violations of federal or state constitutional law. *People v. Towns*, 182 Ill. 2d 491, 502 (1998); *People v. Tenner*, 175 Ill. 2d 372, 377 (1997). A post-conviction action is a collateral proceeding, and not an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999), quoting *People v. Ruiz*, 132 Ill. 2d 1, 9 (1989). The purpose of the proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997); *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered waived. *Towns*, 182 Ill. 2d at 502-03. A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right. *People v. Hobley*, 182 Ill. 2d 404, 427-28 (1998). Rather, an evidentiary hearing is warranted only when the allegations of the post-conviction petition, supported when necessary by the trial record or accompanying affidavits, make a substantial showing that the defendant's constitutional rights have been violated. *Hobley*, 182 Ill. 2d at 428; *Towns*, 182 Ill. 2d at 503. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits must be taken as true. *Towns*, 182 Ill. 2d at 503. A circuit court's dismissal of a post-conviction petition without a hearing will be reviewed *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998).

## II. *Batson* Claim

On appeal, defendant alleges that appellate counsel was ineffective for failing to raise a *Batson* claim as to the prosecutor's use of a peremptory challenge to venireperson Sandra McElwee. At trial, the State used peremptory challenges to exclude from the jury McElwee and two other venirepersons, Robert Canady and Ola Love. At the close of jury selection, trial counsel moved for a mistrial, arguing that the prosecution had improperly used three of its four peremptory challenges to exclude Canady, Love and McElwee, in violation of *Batson*. The trial court found a *prima facie* case of racial discrimination as to the exclusion of Canady and Love. As to McElwee, although trial counsel argued that she was clearly black, the trial court expressed doubt, noting her light complexion and her name. In response to questioning from the trial court, the prosecutor stated that her notes reflected that McElwee was a Caucasian female. The trial court found this perception to be reasonable and concluded that the prosecutor had advanced a race-neutral explanation for excluding McElwee. The trial court denied trial counsel's motion to subpoena McElwee to testify concerning her race. On direct appeal, appellate counsel raised a *Batson* issue as to venirepersons Canady and Love, but not as to McElwee.

*Batson* established a three-step analysis to determine whether or not the State used its peremptory challenges to remove venirepersons on the basis of race. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *Munson*, 171 Ill. 2d at 174; *People v. Hudson*, 157 Ill. 2d 401, 425 (1993). Second, if the defendant has made a *prima facie* showing, the burden then shifts to the State to provide a race-neutral explanation for excluding each venireperson in question. A race-neutral explanation is one based upon something other than the race of the venireperson. In assessing an explanation, the

trial court focuses on the facial validity of the prosecutor's explanation. The explanation need not be persuasive, or even plausible. A legitimate reason is not a reason that makes sense, but rather is a reason that does not deny equal protection. Absent an inherent discriminatory intent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Munson*, 171 Ill. 2d at 174-75. Defense counsel then may rebut the prosecutor's reasons as being pretextual. *People v. Mitchell*, 152 Ill. 2d 274, 288 (1992). Third, the trial court then weighs the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the venireperson, and any rebuttal by defense counsel. *Mitchell*, 152 Ill. 2d at 288. The court must determine whether the defendant has met his or her burden of proving purposeful discrimination. *Munson*, 171 Ill. 2d at 174.

Defendant attached to his post-conviction petition an affidavit of McElwee, in which she stated that she is an African-American woman whose race has been mistaken for Hispanic, but never for Caucasian. At the conclusion of the hearing on the State's motion to dismiss defendant's post-conviction petition, the trial court found that the prosecutor's perception of McElwee's race as Caucasian at the time the peremptory challenge was exercised was significant and that this perception was reasonable, based upon the trial court's observation of McElwee. The court also noted that because the victim was black and the State's principal witnesses were black, the prosecutor would have no motive to exclude black people from the jury.

Defendant now argues that the trial court's finding as to the prosecutor's perception of McElwee's race as Caucasian is erroneous, and that it was the trial court who supplied the race-neutral explanation for McElwee's exclusion from the jury, not the prosecutor. He argues that the prosecutor did not state that she thought Mc-

Elwee was Caucasian and that it was improper for the trial court to rely on its own impression of McElwee, where those impressions were stated prior to inquiry of the prosecutor as to a race-neutral explanation for the peremptory challenge. According to defendant, the prosecutor did not give a race-neutral explanation, but merely expressed uncertainty about McElwee's race.

The State argues that defendant has waived this claim, because he did not raise it in his direct appeal. As stated, determinations made by a reviewing court on direct appeal are *res judicata* as to issues actually decided. Issues that could have been presented on direct appeal, but were not, are deemed waived for purposes of post-conviction review. *People v. Johnson*, 183 Ill. 2d 176, 186 (1998); *Towns*, 182 Ill. 2d at 502-03. Procedural default, however, will be excused where (1) fundamental fairness so requires; (2) the alleged waiver stems from the incompetence of appellate counsel; or (3) the facts relating to the claim do not appear on the face of the original appellate record. *People v. Mahaffey*, 194 Ill. 2d 154, 171 (2000); *People v. Whitehead*, 169 Ill. 2d 355, 371-72 (1996). Ineffective assistance of appellate counsel is judged under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Richardson*, 189 Ill. 2d 401, 412 (2000). Defendant must show that the failure to raise the *Batson* issue regarding McElwee was objectively unreasonable and that, absent this failure, defendant's conviction or sentence would have been reversed. *Richardson*, 189 Ill. 2d at 412. We note that appellate counsel is not required to argue every conceivable issue on appeal. *People v. Tenner*, 175 Ill. 2d 372, 387 (1997). Counsel's decision as to what issues to raise and argue will not be questioned unless that decision is patently wrong. *People v. Madej*, 177 Ill. 2d 116, 159 (1997).

The record reveals that when the trial court asked

the prosecutor her opinion of McElwee's race, she replied, "In my opinion, female white, lab technician, attended the University of Illinois." In a subsequent colloquy, the trial court again asked the prosecutor her opinion as to whether McElwee was Caucasian, Hispanic, or black. The prosecutor replied, "I—I—I'm not sure, Judge. I wrote female white. I really didn't think that hard. I have F.W. Looking back, I don't know, Judge."

Defendant argues that the trial court erred in ruling that defendant had not made a *prima facie* case of racial discrimination as to McElwee on the grounds that the prosecutor's belief that McElwee was Caucasian was reasonable, when the prosecutor did not state that she believed McElwee was in fact Caucasian. The trial record, however, belies this claim. *Batson* requires that a defendant make a *prima facie* showing that the prosecutor has exercised peremptory challenges *on the basis of race*. If that burden is satisfied, the burden shifts to the prosecutor to provide a race-neutral explanation for excluding the particular juror. The trial court must then determine whether the defendant has met his burden of proving *purposeful discrimination. Munson*, 171 Ill. 2d at 174. In the instant case, we conclude that the prosecutor's statements indicate that, at the time she exercised the peremptory challenge to McElwee, she believed that McElwee was Caucasian. Her later statements of uncertainty at the hearing on defendant's *Batson* motion do not detract from this conclusion. The gravamen of a *Batson* claim is purposeful discrimination in excluding venirepersons from the jury on the basis of their race. See *Hernandez v. New York*, 500 U.S. 352, 359-60, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866 (1991).

Defendant argues that the prosecutor did not give a race-neutral explanation for excusing McElwee, because the trial court failed to ask for an explanation. However, no such explanation is required unless the defendant

makes a *prima facie* showing of racial discrimination. The trial court's questioning of the prosecutor was designed to assist it in determining whether defendant had carried his burden. Once the trial court found that the prosecutor's perception of McElwee as Caucasian was objectively reasonable, no further inquiry was required. The trial court did not, as defendant suggests, blindly accept the prosecutor's statements concerning her belief that McElwee was Caucasian. The court set forth its own observations on the record and, based upon those observations, found the prosecutor's belief to be reasonable. Defendant submits that a good-faith question existed with respect to McElwee's race and that the question has now been answered by McElwee's affidavit stating that she is black. However, the prosecutor was not required to establish the empirical truth of her stated belief concerning McElwee's race. It is sufficient that the prosecutor reasonably believed that McElwee was Caucasian at the time the peremptory challenge was exercised. See *People v. Harris*, 164 Ill. 2d 322, 338 (1994).

Accordingly, we conclude that trial counsel's *Batson* challenge as to McElwee had no merit and appellate counsel was not ineffective in failing to raise that issue on direct appeal.

### III. Probable Cause for Arrest

Defendant argues that trial counsel was ineffective for failing to file a motion to quash defendant's arrest on the ground of lack of probable cause. He further argues that the trial court erred in denying an evidentiary hearing on this issue.

At trial, Kenny Curry testified that the day after the murder, he was working on his car at the home of his friend, Kenneth Burks. Defendant came over to Burks' home and began conversing with Burks. Curry noticed that defendant's face had burn marks and was covered

with grease. Defendant told Curry that his "thing [was] taking [people] out of their cars." Defendant elaborated, telling Curry that on the prior evening he set fire to an Amigo truck because "the guy tried [him.]" He shot the man once and then shot him a second time after the man "broke and ran" away from him. Defendant then purchased some gasoline and returned to the area to burn the victim's truck. In the process of burning the truck, defendant's face was burned.

Curry further testified that he later learned that the victim was Marvin Cheeks, the brother of Maurice Cheeks, a professional basketball player. Although Curry did not know Marvin Cheeks, he and a friend (Burks) attended the funeral in anticipation of Maurice Cheeks' presence there. Neither Curry nor Burks immediately reported to the police what defendant had said about the killing.

Detectives Mike Miller and James Hanrahan were assigned to investigate the Cheeks murder. Hanrahan testified that on October 8, 1991, he received a telephone call from a member of the Cheeks family. He and Miller subsequently met with the Cheeks family member, Kenneth Burks and Ricky Vivurette. After speaking with those individuals, Hanrahan and Miller made arrangements with Burks to conduct a mobile surveillance of Burks' car. Miller and Hanrahan followed Burks, with whom Vivurette was riding, for a period of time. Burks eventually parked on West Monroe Street. A person, later identified as defendant, approached Burks' car and began to talk to Burks. After a brief conversation, defendant turned and ran into the building at 2020 West Monroe Street and Burks drove off. Hanrahan and Miller stopped Burks, at which time Burks explained that defendant had seen the detectives parked nearby and believed them to be vice detectives. Defendant told Burks to drive away and to come back. The surveillance continued. Burks

drove off, returned to 2020 West Monroe Street and parked. The detectives observed defendant run out of the 2020 West Monroe Street building and enter the rear of Burks' car. Burks then drove off with both defendant and Vivurette. The detectives followed, eventually stopping Burks' car at North Leavitt Street. Hanrahan first ordered Burks and Vivurette out of the car and then defendant. While Hanrahan searched defendant, Miller searched the backseat of the car, where he found a weapon. At that time, Hanrahan handcuffed defendant and advised him of his *Miranda* warnings. Miller drove the vehicle to a police garage and Hanrahan transported defendant to Area 4 Violent Crimes.

The basis for defendant's claim that his trial counsel was ineffective for failing to file a motion to quash his arrest is that Burks was not a reliable informant. Defendant notes that at the time he came forward, Burks had an expectation of a reward from the Cheeks family. Defendant also notes that Burks did not go directly to the police, but initially contacted the Cheeks family at the victim's funeral. The State argues that defendant has waived review of this claim because it could have been raised on direct review and was not. However, defendant relies on his affidavit attached to his post-conviction petition to support his argument on this issue. As this affidavit is *dehors* the record, a finding of waiver is not appropriate. See *Mahaffey*, 194 Ill. 2d at 171.

Probable cause for a warrantless arrest exists where police have knowledge of facts that would lead a reasonable person to believe that a crime has been committed and that the person to be arrested committed it. *People v. Chapman*, 194 Ill. 2d 186, 216-17 (2000). Where police are acting on an informant's tip, the totality of the circumstances known to the officers must support their reliance on the information provided by the informant. *People v. Kidd*, 175 Ill. 2d 1, 23-24 (1996). The existence

of probable cause is not governed by technical legal rules, but by commonsense considerations that are factual and practical. *People v. Williams*, 147 Ill. 2d 173, 209 (1991).

Defendant argues that Burks' credibility was undermined by the fact that he did not come forward immediately after the alleged conversation with defendant and that he and Curry contacted the victim's family after a reward had been publicized. Defendant also argues that Burks knew he could ensure that defendant would have a gun when he was arrested. Defendant alleges that Burks had given him a gun several days earlier. During the police surveillance of Burks' car, when Burks pulled his car over to pick up defendant, Burks told defendant to go back in the house and get the gun. This last allegation is made in defendant's affidavit attached to his post-conviction petition. Defendant seeks to draw a distinction between Burks and the ordinary citizen informant. However, whether an informant is classified as a citizen informant or a paid informant is unimportant; rather, courts look to the reliability of the informant as only one factor in assessing whether the totality of the circumstances establishes the existence of probable cause. *People v. Adams*, 131 Ill. 2d 387, 397 (1989).

Burks related to police the conversation with defendant two days after the murder in which defendant admitted that he had killed the victim and set fire to his car. Defendant also stated that he had burned his face while burning the victim's car. Burks provided a physical description of defendant and stated that the gun used in the shooting could be found on defendant or in his home. When police arrested defendant, it was immediately apparent to them that defendant had recent, serious burns on his face. Further, the police reports appended to defendant's petition state that Burks related to officers that defendant had appeared at Burks' home hours before the murder looking for a gun and that Burks sold

defendant a gun on credit. Although defendant now contends that Burks set him up by telling him to go inside the house and get the gun, there is no support in the record for this theory. Burks told police that defendant ran into the house because he saw the officers' car and thought they were "vice cops." We note that the record contains no evidence that Burks sought or received a reward from the Cheeks family. Defendant's affidavit attached to his post-conviction petition alleges that on May 10, 1993, he had a telephone conversation with Burks in which Burks denied receiving any reward money. Burks allegedly told defendant that Curry received the reward. This fact, even if true, does not support defendant's argument concerning Burks' reliability.

We conclude that probable cause existed for defendant's warrantless arrest and, thus, he has failed to establish that his trial counsel was ineffective for failing to file a motion to quash the arrest.

### IV. Mitigation Evidence

Defendant next argues that his trial counsel was ineffective for failing to properly investigate and present mitigating evidence at the sentencing hearing. In making this argument, defendant relies on matters *dehors* the record. In such cases, waiver does not operate to foreclose the defendant from raising this claim in his post-conviction petition. See *People v. Holman*, 164 Ill. 2d 356, 362 (1995).

In the context of a second-stage capital sentencing hearing, the *Strickland* standard for proving ineffective assistance of counsel requires a defendant to show that (1) his attorney's performance at the sentencing hearing was deficient, judged by prevailing professional norms and (2) there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating factors did not warrant death. *People v. Johnson*, 183 Ill. 2d 176, 195-96 (1998).

Evidence at the sentencing hearing demonstrated that defendant had one prior conviction for armed robbery in 1989, committed when he was 16 years old. The State presented the testimony of the victim of that offense, Paul Babian. He testified that he was accosted by defendant and two other men as he sat in his car waiting to make a right turn. Defendant pressed the barrel of a gun to Babian's head and ordered him out of the car. Another man got in on the passenger side with a gun drawn and a third man stood in front of the car. Defendant demanded that Babian hand over his wallet and a signet ring Babian was wearing. One of the other men ripped Babian's gold chain off his neck. Babian gave defendant his wallet, but would not take off his ring, arguing that the ring had no value to defendant, as it had Babian's initials on it. Defendant then placed his gun closer to Babian and said, "[D]on't make me kill you, motherfucker, give me the ring." After Babian gave defendant the ring, the men got into Babian's car and drove away.

Defense counsel called 11 witnesses in mitigation. Marlene Wolter, one of defendant's elementary school teachers, testified that defendant was respectful in her class and that he came to her and expressed concern about his younger brother. Defendant knew right from wrong. She recalled investigators coming to the school to investigate defendant's complaint that his mother was neglecting him and his siblings, with no food in the house and the refrigerator locked. Wolter felt that defendant had potential that was not developed and that he was a victim. Defendant had a moderate learning disorder.

Mary Munson, defendant's aunt, testified that at the time of defendant's birth, his mother was living in a four-bedroom apartment with nine other family members. When defendant was approximately five years old, he and his mother moved out. When defendant was 16 years

old, he went to live with his uncle, Roosevelt Munson. Prior to that time, defendant complained to Mary that his mother had beaten him. Mary observed a mark on defendant's thigh. When asked whether defendant was well cared for by his mother, Mary replied that defendant's mother "always kept food, shelter and clothing." Defendant had a job and used the money to buy food. Mary was unaware of whether defendant's mother used illegal drugs.

According to testimony from Stephanie Munson, Roosevelt Munson's daughter, defendant came to live with her family because her mother believed that defendant needed a "real mother" and a "father figure" in his life. Defendant's mother abused drugs and was "never there" for her children. Defendant lived with them for six months to a year and had to go back to his mother when Stephanie's mother became ill and was hospitalized for a long period of time. Defendant was very close to her mother while he lived with them.

Melvin Wilson, defendant's father, testified that he has been continuously incarcerated since 1985 for two murder convictions and has never contributed to defendant's support. Wilson stated that he had neglected defendant, as had defendant's mother.

Janie Munson, defendant's aunt, testified that defendant and his mother lived with her family for a time in 1979 or 1980, when his mother was evicted from "the projects." Defendant cooked and cleaned for his siblings.

Jamesetta Dixon testified that she lived with defendant and his mother from 1983 to 1988. Dixon was engaged in prostitution and defendant's mother sometimes went with her when she left the house. Defendant cared for Dixon's children and his own siblings while they were gone. Both she and defendant's mother used drugs during this time.

Renard Munson, defendant's brother, testified that defendant was the father he never had. During the time they lived together, defendant offered Renard advice and encouraged him in school. Defendant sometimes talked to Renard's teachers on his behalf. Defendant purchased Renard's school supplies and clothes.

Frances Munson, defendant's mother, testified that she has six children. She was never married to any of their fathers. She used drugs while living with Jamesetta Dixon.

Lintreatha Munson, defendant's aunt, testified that defendant worked at a shop making leather belts and he took care of his brother and sisters. He fed and clothed them, bought them things, gave them a bath, put them to bed, and took them to school in the mornings.

James Jones testified that he formerly employed defendant at his leather craft shop from 1981 to 1984. Defendant most often spent his paycheck on his family. Defendant's mother would often act as if she were using drugs. Two days prior to his arrest in this case, defendant asked Jones to help him find a job. Jones stated that he felt defendant was a "good kid" and that he had gone "astray." Defendant is a "smart kid" and always liked going to school.

Defendant complains that the trial court was not properly informed by this testimony about defendant's life and the effects that his troubled childhood had on his development. Trial counsel did not present any evidence of defendant's learning disability or any psychological or developmental evaluations. Thus, according to defendant, his trial counsel should have presented the testimony of a mitigation specialist. In support of this claim, defendant has attached to his post-conviction petition an affidavit of Caryn Platt Tatelli, a licensed clinical forensic social worker. Tatelli stated in her affidavit that she was formerly employed as a mitigation specialist by the Il-

linois Capital Resource Center (now the Capital Litigation Division of the Illinois State Appellate Defender's Office). Her duties consisted of investigating, compiling, and analyzing developmentally related materials for capital defendants. Tatelli had completed mitigation investigations and interviews for approximately 30 capital cases. In the preparation of her report, Tatelli interviewed defendant and 15 relatives, friends, and others who had significant knowledge of defendant. She also reviewed 1,000 pages of documents.

Tatelli noted defendant's lack of a positive male role model and indicated that a fatherless child may become parentified and turn to gangs and other counterculture groups. They may also, as in defendant's case, turn to other men in the community such as drug dealers. Tatelli concluded that defendant was a parentified child with an abusive, neglectful, drug-addicted mother and no father. He was forced to earn money to support his siblings and struggled academically. When he could not earn enough money at the leather craft shop, he delivered drugs for older men. In his adolescence, he turned to dealing drugs to support his family.

In addition to the lack of a father, Tatelli concluded, defendant was not bonded to his mother. A school psychologist's report completed when defendant was eight years old concluded that defendant's innate intellectual development was at least at the average level, but he had a short attention span, shallow concentration, and an overactive nature. Due to the wide discrepancy between defendant's ability and his achievement, he was placed in a severe disabled learning classroom. He was evaluated again at age 12 and was found to have improved in his academic subjects. Defendant was placed in a regular classroom at age 14 and, despite exhibiting failing grades, was promoted to ninth grade.

In summarizing her findings, Tatelli stated that

defendant's developmental life experiences were so far out of the range of the norm that they impacted him profoundly and "quite probably" altered the course of his life. During a time when defendant should have been developing close friendships and mastering many of the basic skills of life, he was saddled with adult responsibilities in providing and caring for his younger siblings. He was providing for his family by dealing illegal drugs and, "as one might expect," spent much of his early adulthood in prison.

In addressing the mitigation issue at the hearing on the State's motion to dismiss defendant's petition, the trial court expressed its doubts about whether there is such a thing as a "mitigation expert." The court also commented at length on the question of whether Tatelli could be qualified as an expert witness. We need not address these questions, however, because the basis for the trial court's ruling on the mitigation issue was that much of the material contained in the affidavits attached to defendant's petition was cumulative of the evidence that was presented at the sentencing hearing. The court noted that defendant's trial counsel investigated and presented evidence in mitigation and that counsel consulted with mitigation specialist Jeffrey Eno. The court also concluded that defendant had failed to establish that the information sought to be presented is beyond the knowledge of the ordinary person. In this context, the court noted that the fact a hostile environment may adversely affect people is within the knowledge of laypersons generally. The court noted that defendant's background had been fully explored at the sentencing hearing and that defendant had not demonstrated that presentation of Tatelli's testimony or further testimony from other witnesses would have prompted the court to impose a sentence of imprisonment, rather than the death penalty.

Counsel at a capital sentencing hearing has a duty to conduct a reasonable investigation into potential sources of mitigating evidence to present at the sentencing hearing, or must have a legitimate reason for failing to do so. *People v. Jackson*, 205 Ill. 2d 247, 261 (2001). A mitigation specialist is not crucial to a defendant's ability to marshal evidence in mitigation. *People v. Burt*, 168 Ill. 2d 49, 78 (1995). This court has held that a trial court is not constitutionally required to appoint a mitigation specialist, as defense counsel is capable of obtaining and presenting such evidence. *People v. Lear*, 143 Ill. 2d 138, 148 (1991).

In the instant case, defendant's trial counsel presented the testimony of 11 witnesses in mitigation. Counsel also secured the services of mitigation specialist Jeffrey Eno. Eno's affidavit, attached to defendant's petition, stated that he did not prepare a written report due to counsel's cancellation of meetings with him. However, we note that, although Eno did not testify, he was available to consult with counsel. The witnesses who testified informed the trial court about defendant's troubled childhood, including his drug-addicted, neglectful mother, the absence of his father, and the responsibility for his family placed upon defendant at a young age. That the abuse and neglect of a child, the absence of a parent in the household, and the parentification of a child may have adverse effects on that child is not within the exclusive knowledge of a mitigation specialist. Defendant has not alleged that he suffered from any recognized psychological impairment or mental disability that might have required the testimony of an expert. Accordingly, we conclude that trial counsel was not professionally deficient in failing to secure the testimony of a mitigation specialist. Defendant attached to his petition several affidavits of potential witnesses. However, much of the content of these affidavits is cumulative of evidence

already heard by the trial court at sentencing or adds little to the testimony heard by the court. For example, the affidavit of Diane Faubl, one of defendant's teachers, stated that defendant was an average student who never got into trouble and tried to help other students and his siblings. Marlene Wolter, one of defendant's teachers, testified at the sentencing hearing that defendant was respectful in her class and demonstrated concern for his siblings. Faubl's testimony would have added nothing new to this evidence. Loretta Kindhart, defendant's teacher in his learning disabled class, stated in her affidavit that defendant tried to keep her from understanding how bad things were at home and that she had several conversations with defendant's mother, who appeared to be "high" on drugs. The trial court heard extensive evidence at sentencing concerning Frances Munson's drug use. Roosevelt Munson, defendant's uncle, who testified at the sentencing hearing, provided an affidavit that contained additional detail about defendant's life, such as his mother's drug addiction, his lack of a father, his efforts to support his siblings, and the family's attempts to help defendant. The trial court heard this information from Roosevelt and others at the sentencing hearing. Roosevelt's affidavit is merely cumulative of that evidence. Similarly, the affidavit of Julie Munson, defendant's cousin, is cumulative of evidence heard at the sentencing hearing regarding defendant's difficult childhood. We note also that many of the affidavits of potential witnesses attached to defendant's petition stated not only facts, but also the affiants' speculation, analyses, and opinions of the effect defendant's difficulties had on him as he was growing up.

Evidence of a difficult childhood or developmental problems, we note, is not inherently mitigating. *People v. Emerson*, 189 Ill. 2d 436, 495 (2000). The sentencer may regard the evidence as aggravating, especially if the

evidence suggests that defendant might pose a danger in the future. *People v. Montgomery*, 192 Ill. 2d 642, 673 (2000).

We conclude that trial counsel was not professionally deficient for failing to call additional witnesses to testify or for failing to elicit additional details from the witnesses who did testify. Further, counsel was not deficient for failing to have a mitigation specialist testify, as such testimony was unnecessary. Since much of the proffered evidence was cumulative and may have been viewed as aggravating, we also conclude that defendant has failed to establish that a reasonable probability exists that the trial court would not have imposed the death penalty had this evidence been presented at sentencing.

## V. Disparate Sentence

Defendant argues that his death sentence is unreasonably disparate to the 60-year prison term imposed on his codefendant, Darryl Clemons. He contends that Clemons played an equally active role in the crime, had a more extensive criminal history than defendant, and had negligible rehabilitative potential.

The State argues that this issue is foreclosed by defendant's failure to include it in his post-sentencing motion. However, since defendant was sentenced on June 10, 1993, and the record on appeal shows that Clemons was sentenced on February 18, 1994, this issue could not have been preserved for review. Appellate counsel did not raise this issue in the direct appeal. However, where a defendant relies on matters outside the record in support of a post-conviction claim, we will not find waiver. *Holman*, 164 Ill. 2d at 362.

Comparative proportionality review in death penalty cases is not required by the United States Constitution and is not a feature of the Illinois death penalty statute. *People v. Jimerson*, 127 Ill. 2d 12, 54 (1989). Nonetheless, this court has the constitutional duty to determine

whether a death sentence has been imposed arbitrarily or capriciously, or is unduly severe, considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. To guarantee the individualized sentencing that the eighth amendment (U.S. Const., amend. VIII) requires, this court has compared a defendant's death sentence to the sentence of a codefendant or an accomplice. This court has focused on the nature of the offense, each individual's relative involvement in the offense, his character, background, criminal record, and his potential for rehabilitation. See, e.g., *People v. Kitchen*, 159 Ill. 2d 1, 44 (1994); *People v. Bean*, 137 Ill. 2d 65, 134 (1990).

Defendant had one prior conviction for armed robbery in 1989, committed when he was 16 years old. The trial court heard details of that offense at defendant's sentencing hearing. Following his arrest for the Babian armed robbery, defendant gave a statement to an assistant State's Attorney in which he named Clemons as one of the men with him during the robbery. Defendant was sentenced to a prison term of six years. He had been released on parole three months before the Cheeks murder. We have allowed defendant to supplement the record on appeal with the transcript of Clemons' sentencing hearing in the Cheeks murder. It shows that Clemons had four prior arrests for burglary, theft, and armed robbery. He was on home monitoring at the time of the Cheeks murder.

Defendant gave a series of statements to the police following his arrest for Cheeks' murder. In his final statement given to Detective Gene Harris and Assistant State's Attorney Charles Burns, defendant stated that he and Clemons had staked out some public telephones waiting for someone to rob. Cheeks pulled up to the telephones in a black Jeep-type vehicle. He got out and used the telephone. Defendant told Clemons that they were

going to rob Cheeks. At the time, defendant was armed with a Colt Python .357 Magnum. Defendant and Clemons approached the vehicle. Cheeks appeared to have fallen asleep. Defendant pointed his gun at Cheeks and told him to move over to the passenger's side of the vehicle. Defendant got in the driver's side while Clemons entered the backseat. They took Cheeks' coat, gold chain, watch and cash. Eventually, defendant, Clemons, and Cheeks switched seats. Cheeks ended up back in the driver's seat with defendant in the backseat. While defendant held the gun on Cheeks, Clemons instructed Cheeks to drive west on the Eisenhower Expressway. Because the vehicle was low on gasoline, Cheeks exited the expressway at Ashland Avenue and pulled into a gasoline station. Clemons pumped the gasoline. Cheeks told defendant his name and that he was a fireman. Defendant stated that at this point, he wanted to get away, but he was afraid that Cheeks would report the incident to police. After purchasing the gas, Clemons ordered Cheeks to continue driving west on the expressway. Cheeks continued on the Eisenhower, exited north onto Kostner Avenue, and ultimately proceeded west on Van Buren Street. After passing under a viaduct, Clemons told Cheeks to pull into a vacant lot. Cheeks panicked and attempted to grab the gun. The gun discharged twice. Defendant jumped into the front passenger seat, accidently releasing Cheeks' safety belt, and Cheeks jumped from the vehicle and ran. Defendant did not admit killing Cheeks. Instead, defendant stated that he did not chase Cheeks and he and Clemons started to walk away. Defendant then realized that he might have left fingerprints inside the vehicle by which he could be identified. Defendant then told Clemons that they had to destroy the vehicle. The two purchased gasoline, poured it on the dashboard of the vehicle and tried, unsuccessfully, to ignite it with a cigarette lighter. On the second attempt, there was an explosion that burned defendant's face.

At Clemons' sentencing hearing, his parents testified in mitigation. In arguing for the death penalty for Clemons, the prosecutor noted a statement given to Harris and Burns by Clemons in which he stated that when Cheeks ran from the car, Clemons chased and tackled him three times. After that, defendant shot Cheeks twice.

In declining to impose the death penalty on Clemons, the trial judge, who also presided over defendant's trial, found that Clemons' situation differed from that of defendant. The court concluded that the nature of defendant's one armed robbery conviction was more serious than Clemons' multiple arrests. The court found particularly aggravating the fact that defendant placed a gun to Babian's head and threatened to kill him if he did not cooperate. The court expressed its opinion that this act "substantially dwarfs" Clemons' prior record of criminality. While acknowledging that Clemons was actively involved in the Cheeks murder, the court noted that defendant was the one who actually shot Cheeks multiple times.

Following defendant's sentencing hearing, the trial court found the existence of several aggravating factors and further explained its decision to impose the death penalty. While acknowledging the mitigating evidence presented by trial counsel, the court noted contradictions in the evidence. For instance, the court found it contradictory that the evidence showed defendant's concern for his family, while he apparently has no feelings of brotherhood with people outside his family. The court noted that defendant's immediate family was in considerable disarray, but that his extended family was caring and supportive. The court also found it contradictory that testimony showed defendant's mother was a prostitute and drug abuser, yet one of defendant's aunts testified that defendant's mother provided him with food and shelter. The court also noted that, while defendant's own

father was absent from the home, defendant had male role models in his employer, Jones, and his uncle Roosevelt. The court found it significant that defendant committed the Cheeks murder shortly after being released from prison for the armed robbery of Paul Babian. The court also noted that defendant possessed a loaded handgun several days after the murder, demonstrating a lack of remorse. The court referred to the murder as a "cold-blooded planned killing." The court found that defendant's actions did not speak well for his rehabilitative potential.

We conclude that defendant's death sentence is not unreasonably disparate to Clemons' 60-year prison term. Although Clemons actively participated in the murder, defendant had the gun and shot Cheeks four times. In addition, although Clemons prevented Cheeks from running away, defendant had the last chance to save Cheeks' life and, instead, chose to shoot him twice more. See *People v. Kliner*, 185 Ill. 2d 81, 176 (1998) (codefendant not equally culpable where defendant shot the victim repeatedly and had final opportunity to preserve victim's life when his gun jammed); *People v. St. Pierre*, 146 Ill. 2d 494, 514 (1992) (defendant's death sentence not unreasonably disparate to prison sentence of accomplices where, although accomplices conceived the plan to kill the victims, defendant was the one who struck one victim in the head with a hammer repeatedly, waited for the second victim to arrive home and did the same thing to her); *People v. Ashford*, 121 Ill. 2d 55, 88-89 (1988) (death sentence not unreasonably disparate where defendant shot all or almost all of the victims, despite accomplice's more serious criminal background).

In regard to defendant's lack of remorse, we also note the evidence at trial from Kenny Curry, to whom defendant bragged about the murder, stating that his "thing [was] taking [people] out of their cars." Defendant was

the principal actor in the armed robbery of Babian, for which he served prison time. The instant offense was committed within a few months of defendant's release from prison in which defendant again was the principal actor and the sole shooter. In light of this evidence, we do not find significant the fact that defendant had only one conviction, while Clemons had four arrests and was on home monitoring at the time of the offense. While defendant may have had a less desirable family life than did Clemons, with the absence of one parent and the drug addiction of the other, the trial court found the evidence to be inconsistent in some respects. In addition, we note again that evidence of a turbulent childhood is not inherently mitigating. Defendant turned to drug-running and selling drugs at a young age and, regardless of the stated reason for this, such conduct may be viewed as indicating a propensity to commit crimes.

### VI. Failure of Post-conviction Counsel to Comply With Rule 651(c)

Defendant alleges that his post-conviction counsel failed to comply with Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)), which requires the record on appeal to show that post-conviction counsel consulted with the defendant by mail or in person to ascertain the defendant's contentions of deprivation of constitutional rights, examined the record of proceedings at trial, and made any amendments to the *pro se* petition that were necessary for the adequate presentation of the defendant's contentions. Compliance with the duties set forth in this rule is mandatory. *People v. Szabo*, 144 Ill. 2d 525, 532 (1991). Defendants in post-conviction proceedings are entitled to a "reasonable" level of assistance. Because post-conviction proceedings derive from statute, rather than from the federal or state constitutions, a defendant may not claim sixth amendment ineffective assistance of post-conviction counsel. *People v. Wright*, 149 Ill. 2d 36, 64 (1992).

Defendant's first argument involves ballistics testing of the Colt revolver found in his possession when he was arrested. Police recovered a bullet jacket from Cheeks' vehicle. At trial, the State's ballistics expert testified that he had examined the gun and the recovered bullet jacket and determined that the jacket could have been fired by the gun, but he was unable to form an opinion that the jacket was in fact fired from that particular gun. In an amended post-conviction petition, defendant argued that trial counsel was ineffective for failing to obtain further forensic testing of the gun in an attempt to rule out the gun as the source of the jacket found in the Cheeks vehicle. Post-conviction counsel filed a motion for discovery, asking the court to order the State to produce the gun and jacket for further testing. The trial court denied the motion. Defendant does not now claim error in the trial court's ruling. Instead, recognizing that discovery is granted in post-conviction proceedings only upon a showing of "good cause" (*People v. Fair*, 193 Ill. 2d 256, 264-65 (2000)), defendant argues that his post-conviction counsel should have supplemented the motion for discovery with an affidavit from a ballistics expert. We allowed defendant's motion to supplement the record on appeal with the affidavit of Larry Hood. Hood states that he is a retired police officer who has been qualified numerous times as an expert in the areas of firearms and arson investigation. Hood stated that he could not tell from the bullet jacket whether it came from a .357 Magnum or a .38 Special weapon and, without an opportunity to examine the weapon, he could not say with certainty whether the gun recovered from defendant was capable of firing bullets of both calibers or only one of them. Hood also stated that further examination of the jacket and comparison to the weapon found during defendant's arrest "could eliminate" the possibility that the jacket came from that weapon.

At the trial, Robert Smith, qualified by the trial court as an expert in firearms examination, testified that he examined the bullet jacket found in Cheeks' vehicle and examined and test-fired the gun taken at the time of defendant's arrest. Because the jacket was in a mutilated condition, Smith was unable to form an opinion that it was fired from one particular gun. The class characteristics of the jacket would be consistent with the class characteristics of the Colt revolver. Thus, the bullet could have been fired from that gun. On cross-examination, defense counsel elicited testimony from Smith that weapons of this caliber are very common and that the jacket could have been fired from tens of thousands of other such weapons.

Contrary to defendant's contention, Hood's affidavit does not establish that further analysis would have demonstrated that the jacket was not fired from the gun found in defendant's possession. Hood merely stated that such analysis "could" eliminate the gun as the source of the spent jacket. It is, of course, theoretically possible that further testing might have determined that the jacket was not fired from the gun. On the other hand, it is equally possible, theoretically, that such testing might determine that the jacket was in fact fired from the gun defendant possessed. In reality, however, with the jacket in the mutilated condition as described by Smith, it is doubtful that further testing would have been useful. Instead of having the gun and jacket further tested, it is likely that trial counsel made a strategic decision to emphasize to the jury through cross-examination of the State's expert witness that the bullet jacket could not be tied to the gun recovered from defendant and that the jacket could potentially have been fired by literally thousands of other such guns. Decisions concerning what witnesses to call and what evidence to present on a defendant's behalf are viewed as matters of trial strategy.

Such decisions are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432 (1999). Under these circumstances, post-conviction counsel did not fail to render reasonably effective assistance with regard to defendant's discovery motion.

Defendant next argues that post-conviction counsel erred in failing to properly support with documentation defendant's claim that his death sentence was unreasonably disparate to Clemons' prison sentence. Defendant alleges that counsel attached only the unpublished order of the appellate court (No. 1—94—2850 (unpublished order under Supreme Court Rule 23)) in Clemons' case to the petition and, 29 days after the petition was dismissed, filed a motion for reconsideration that included an "utterly indecipherable" numerical printout of Clemons' criminal history, and cover sheets for Clemons' presentence report and the transcript of his sentencing hearing, which were asserted to be currently unavailable.

We need not address defendant's contention here, in light of our determination that defendant's sentence is not unreasonably disparate to Clemons' sentence.

Defendant next argues that post-conviction counsel erred in failing to raise a claim that Kenny Curry expected and received a reward for his trial testimony. Defendant alleges that he submitted an affidavit to his attorney stating that Kenneth Burks told him that Curry had received the reward, but counsel failed to append the affidavit to the petition.

We have allowed defendant to supplement the record on appeal with his affidavit. He states therein that on May 10, 1993, he called his aunt, Julie Munson, gave her Burks' telephone number and asked her to initiate a three-way call. Julie did so and defendant then spoke to Burks. Defendant asked Burks why he lied and cooper-

ated with police in arresting defendant. Burks replied that he "didn't do nothing." He said, "The other Kenny did it. He's the one who got paid for [testifying]. He got the reward money. I didn't do nothing."

There is no evidence in the record on appeal showing or even suggesting that the Cheeks family offered a reward. Nor is there any evidence that Curry received a reward from the Cheeks family. Defendant has filed a newspaper article which indicates that Cheeks' father had offered a $2,500 reward. Trial counsel did not question Curry at trial about a reward. However, on cross-examination, counsel elicited testimony that Curry knew Cheeks had a brother who was a National Basketball Association (NBA) player and, presumably, made a lot of money. Counsel also questioned Curry about why he did not go to police immediately after his conversation with defendant, when he first learned of the victim's identity, and why he had gone to Cheeks' funeral. In addition, counsel attempted to cross-examine a police detective about whether Mark Cheeks told him that a reward was being offered, but the State's objection was sustained on hearsay grounds. Although trial counsel could have called the victim's brother, Mark Cheeks, as a witness and questioned him concerning whether a reward had been offered and paid, the potential results of such an examination were unknown. By getting the issue of the reward in front of the jury, counsel attempted to convey the impression that a reward had been offered and that Curry expected to be paid that reward. In his closing argument, counsel argued that Curry had an agenda, that he knew the victim was related to a well-paid NBA player and that he went to the Cheeks family with the intention of collecting a reward. Post-conviction counsel did not fail to render reasonably effective assistance by not raising a claim that Curry received a reward for his testimony.

### VII. *Pro Se* Arguments

With leave of this court, defendant has filed a *pro se* brief in which he raises four additional issues for our consideration.

### A. *Ineffectiveness of Trial Counsel at Closing Argument*

Defendant argues that his trial counsel presented a "rambling[,] incoherent[,] offensive" closing argument at the guilt-innocence phase of the trial that conceded defendant's guilt and attacked the victim and other witnesses. This led to a "vitriolic" rebuttal argument by the State, which, according to defendant, implied that counsel's tactics were further evidence of defendant's guilt.

We first note that defendant has waived this argument. After trial counsel filed post-trial and post-sentencing motions, defendant alleged ineffectiveness of counsel and asked the trial court to appoint another attorney to argue the motions. When the court asked defendant to specify his complaints about counsel, defendant pointed to his waiver of a jury for sentencing and the number of peremptory challenges that were given him, and asked that certain impounded exhibits be returned to him. Defendant did not voice any complaints about trial counsel's closing argument. Further, defendant has waived this argument because his appellate counsel could have, but did not, raise any issue about trial counsel's closing argument in defendant's direct appeal. To prevail on this issue, therefore, defendant must demonstrate ineffectiveness of appellate counsel under the *Strickland* standard.

In statements given to police and an assistant State's Attorney, defendant confessed to robbing and shooting Cheeks, although he did not admit killing him. The jury heard testimony from Curry, describing his conversation with defendant, wherein defendant admitted killing a man and burning his vehicle. The State presented

evidence of burns on defendant's face at the time he was arrested. The jury heard evidence that the gun found in defendant's possession when he was arrested could have fired the bullet jacket found in the Cheeks vehicle. In addition, the State presented testimony that defendant confessed to the murder to his mother and a paramedic. Defendant did not testify at the trial and defense counsel offered no evidence.

Trial counsel then was presented with a difficult task in constructing his closing argument. Contrary to defendant's contention, counsel did not concede defendant's guilt of the murder. Although counsel did concede that defendant was found in possession of a gun at the time of his arrest, he could not have credibly claimed otherwise. Counsel emphasized, however, that the State's firearm expert could not connect the gun to the bullet jacket found in Cheeks' vehicle and that thousands of such guns could have fired the shots. Counsel further argued that, even though defendant's fingerprints were found on the gun, his prints were not found on the trigger. Counsel argued that unidentified fingerprints on the gun may have belonged to Clemons and that it was possible that Clemons fired the fatal shots. Counsel argued that Curry had an "agenda" in testifying, because he expected to receive a reward from the Cheeks family. Attempting to explain why defendant would refuse to name Clemons as his accomplice in his statements to police, counsel suggested that defendant had a high regard or affection for Clemons. Counsel noted that the evidence showed that two of Cheeks' wounds were superficial, thus corroborating defendant's statement that the gun went off accidentally in the vehicle when Cheeks grabbed it. Counsel referred to Cheeks' intoxication as suggesting that Cheeks may have acted rashly that night, precipitating the struggle over the gun. Throughout his closing argument, trial counsel reminded the jury that the State

had the burden of proving defendant guilty beyond a reasonable doubt.

We conclude that trial counsel was not ineffective in his closing argument. In fact, given the evidence against defendant, counsel did an admirable job in attempting to create reasonable doubt in the minds of the jurors. We also necessarily conclude that appellate counsel was not ineffective for failing to raise this issue in the direct appeal.

### B. *Prosecutor's Closing Argument*

Defendant argues that the prosecutor repeatedly commented on defendant's failure to testify at the trial. He argues that these comments deprived him of his constitutional right to a fair trial. He also argues that his appellate counsel was ineffective for failing to raise this issue in the direct appeal. During his closing argument, trial counsel told the jury that the State had produced no eyewitnesses to the crime and that the State bore the burden of establishing how the offense occurred. In rebuttal, the prosecutor stated that defendant was an eyewitness to the crime, as well as Clemons, and that defendant did not mention Clemons' name in his statements to police, because he did not want Clemons to talk to the police.

Defense counsel did not object to these comments or include the issue in a post-trial motion, thus waiving the issue for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Appellate counsel did not raise this issue in the direct appeal, resulting in waiver for post-conviction review. *People v. Coleman*, 168 Ill. 2d 509, 522 (1995).

We conclude that appellate counsel was not ineffective for failing to raise this issue. In telling the jury that defendant was an eyewitness to the crime, the prosecutor was responding to the comments of defendant's trial counsel when he asserted that the State had produced no

eyewitnesses. A prosecutor may respond to comments made by defense counsel in closing argument that clearly invite a response. *Kliner*, 185 Ill. 2d at 154. That defendant was an eyewitness was established by his own statements to police. In making the complained-of comments to the jury, the prosecutor merely reminded the jury that defendant had, by his own words, placed himself at the scene of the crime. The prosecutor did not, by doing so, comment on defendant's failure to testify. Defendant also complains that the prosecutor emphasized that its own witnesses had testified, specifically Curry and Detective Harris. The prosecutor stated that Curry "came in here, he took that witness stand and he told you what his buddy told him." She also reminded the jury that Detective Harris testified that, in Harris' presence, defendant told his mother that he "killed a man and torched his truck." These statements did not refer to defendant's failure to testify, but instead suggested to the jury that, given the evidence, it was not necessary for the State to produce eyewitnesses to the crime.

Defendant also argues that the State made improper comments regarding Clemons and asked the jury to infer that Clemons had implicated defendant. Specifically, defendant challenges the prosecutor's comments during her rebuttal argument that the State could not, under the law, bring the jury the statement of Clemons and that the jury was not to consider the involvement of Clemons in determining defendant's guilt. Defendant claims this was a violation of *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965), and *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). In *Bruton*, the Supreme Court held that the admission at a joint trial of a statement by a nontestifying codefendant that expressly implicated defendant in the crime violates the defendant's right to confront witnesses against him. *Bruton*, 391 U.S. at 137,

20 L. Ed. 2d at 485-86, 88 S. Ct. at 1628. As defendant was not tried with Clemons at a joint trial and the State did not attempt to introduce any statement of Clemons against defendant, *Bruton* does not apply here. *Griffin* held that it is a violation of a defendant's constitutional right against self-incrimination (U.S. Const., amends. V, XIV) when the prosecution comments on the defendant's failure to testify. *Griffin*, 380 U.S. at 615, 14 L. Ed. 2d at 110, 85 S. Ct. at 1233.

The prosecutor's comment to the jury that she could not produce any statement of Clemons was simply an accurate statement of the law. Moreover, this comment was invited by defense counsel's comments in his closing argument regarding the fact that there were no eyewitnesses to the murder of Cheeks. Defendant further argues that the prosecutor erred in stating that the reason defendant did not want to mention Clemons' name in his statements was because Clemons was the other eyewitness. We fail to see how this constitutes improper comment on defendant's failure to testify. In his closing argument, defense counsel told the jury that defendant refused to name Clemons because he had a high regard or affection for Clemons. The prosecutor's comment simply suggested another reason why defendant would not name his accomplice. This is not improper argument. Accordingly, defendant's appellate counsel was not ineffective for failing to raise this issue in the direct appeal. The issue was waived and, in any event, lacked merit.

## C. *Brady Violation*

Defendant argues that the prosecution committed a violation under *Brady v. Maryland* when it failed to disclose the criminal records of Burks, Curry and Vivurette. He claims such information would have been useful for impeachment and would have supported his claim that the three men were working as informants.

He notes that this information was requested by the defense in a discovery motion. This issue was not included in any post-trial motion filed by defense counsel nor was it raised in defendant's direct appeal.

Defendant's argument is misplaced as to Burks and Vivurette, as neither man testified at defendant's trial. Defendant has appended to his *pro se* brief an abstract of Curry's criminal record. A review of that record shows that Curry had no convictions that could have been used to impeach his credibility under the rule of *People v. Montgomery*, 47 Ill. 2d 510, 516-17 (1971). Accordingly, we conclude that appellate counsel was not ineffective for failing to raise a nonmeritorious issue on direct appeal.

### VIII. Use of Perjured Testimony

Defendant argues that the State used false testimony or failed to correct false testimony. Specifically, he argues that the State failed to correct the false impression left by Curry that he did not expect a reward for his testimony. Defendant also argues that the State failed to correct false testimony from paramedic Terry Merriweather that she examined defendant and he made incriminating statements to her.

A prosecutor's knowing use of perjured testimony in a criminal prosecution violates due process and entitles the defendant to a new trial. *People v. Jimerson*, 166 Ill. 2d 211, 223-24 (1995), quoting *People v. McKinney*, 31 Ill. 2d 246, 247 (1964). This principle applies both where the prosecutor procures false testimony and where the witness testifies falsely of his or her own accord and the prosecutor knowingly fails to correct the falsity. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959).

We note that neither Burks nor Vivurette testified at defendant's trial. As to Curry, although defense counsel cross-examined him about his motives for revealing his

conversation with defendant, Curry did not testify regarding any expectation or receipt of a reward. Thus, his testimony could not have directly conveyed any impression to the jury on that issue.

Defendant's last argument is that the State failed to correct the perjured testimony of paramedic Terry Merriweather. At trial, Merriweather testified that in October 1991, she was responsible for the intake of inmates at the Cook County jail. She processed them, performed physical examinations and drew blood. While processing defendant, he told her that his face had been burned five days before. Merriweather also testified that there had been some confusion in the receiving area about defendant being the man who killed Cheeks. She asked him if he was that man and defendant said yes. When she asked defendant how his face became burned, he told her that after he killed Cheeks, he tried to torch the car and he was caught in the flames. On cross-examination, Merriweather testified that she examined defendant's body and they discussed an old gunshot wound he had sustained several years before. While processing defendant, Merriweather used a form called a "bruise sheet" to write down defendant's medical information.

Defendant now argues that this testimony was false, because "jail procedures and policy" prohibit examinations of prisoners by members of the opposite sex. He submits affidavits of jail inmates verifying this allegation. These affidavits, however, only relate the inmates' own experiences or state that they have never seen a female paramedic conduct a physical examination, or contain hearsay as to what they were told by others in regard to not undressing in front of a woman. These affidavits do not adequately support defendant's contention that Merriweather perjured herself. We conclude, therefore, that defendant has not made the requisite showing that the State knowingly failed to correct perjured testimony.

## CONCLUSION

Accordingly, we affirm the circuit court's judgment dismissing defendant's post-conviction petition without an evidentiary hearing. The clerk of this court is directed to enter an order setting Tuesday, November 26, 2002, as the date on which the sentence of death entered in the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 2000)). The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

The proceedings which culminated in Munson's convictions and sentence of death were fatally flawed because they did not comport with the new rules enacted by our court governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us. Because Munson was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Munson were not entitled to the benefit of the new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const.,

amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Munson's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 2000).

JUSTICE KILBRIDE, also dissenting:

Defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. See *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting). For the reasons expressed in my dissents in *Hickey* and *Simpson*, I maintain that convictions and sentences obtained in capital cases prior to this court's adoption of the new rules are inherently unreliable because the old system did not adequately protect a defendant's constitutional rights. The new rules were promulgated to address these constitutional deficiencies and, as a result, must be applied retroactively to all capital cases currently being reviewed by this court. See *People v. Hudson*, 195 Ill. 2d 117, 126 (2001), citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987).