2022 IL App (1st) 200979-U

THIRD DIVISION
September 21, 2022

No. 1-20-0979

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 1610901 |
| | ) | |
| MICHAEL TEMPLE, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Angela Munari-Petrone, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Gordon and Reyes concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court did not err in the second-stage dismissal of defendant's postconviction petition where (1) defendant failed to make a substantial showing of actual innocence; and (2) defendant has failed to set forth a substantial showing of ineffective assistance of counsel for failing to present an alibi defense and a claim of conflict of interest based on trial counsel's personal and professional issues.

¶ 2  Defendant Michael Temple appeals the trial court's second stage dismissal of his postconviction petition, arguing that he set forth a substantial showing of: (1) actual innocence based on newly discovered evidence from two eyewitnesses; and (2) ineffective assistance of

trial counsel (a) for failing to raise an alibi defense at trial, and (b) trial counsel's alleged personal and professional issues created a conflict of interest.

¶ 3    Following a jury trial, defendant was found guilty of the August 2009 first degree murder of Ulises Patino and the attempted murder of Israel Negrete. Defendant received a sentence of 45 years in prison for the first degree murder conviction and 31 years for the attempted first degree murder conviction, to be served consecutively, for a total sentence of 76 years. We outline the evidence presented at defendant's trial as necessary for our disposition of this appeal. A full discussion of defendant's trial was set forth in *People v. Temple*, 2014 IL App (1st) 111653.

¶ 4    At approximately 8:25 p.m. on August 10, 2009, Jesus Patino was walking north on South Calhoun Avenue toward West 107th Street with his brother Ulises, Alejandra Gonzalez, and Negrete. While they were walking, Patino saw a car "kind of speeding" toward Calhoun and he told his friends to "look out for the car because it looks suspicious." As the car approached the stop sign, it slowed down, then sped up again and "that's when a shot was fired." Patino saw a Caucasian arm hanging out of the driver's side window with a gun and heard a gunshot. After the first shot, he recognized the driver and shooter as defendant. Patino attended school with defendant, but they were not friends. He was about 40 to 45 feet away when he identified defendant; the sun was still out, the streetlights were just turning on, no cars were parked on the street, and nothing blocked Patino's view of defendant. He also saw three African American men in the car with defendant, but he only saw defendant fire a gun.

¶ 5    After the first shot, Patino turned and ran south on Calhoun. He heard eight to ten additional gunshots, but he did not look back until the gunshots stopped. He observed the car turn left onto Bensley Avenue. He then saw that Ulises and Negrete had both been shot. Patino called 911 for an ambulance, and also gave a description of the vehicle: a four-door, light blue

Oldsmobile Cutlass that drove toward Bensley and 107th. When the police arrived, Patino told them that defendant was the shooter, identifying him by the name Michael Temple, as well as defendant's nicknames of "White Boy Slim" and "Snowflake." Ulises and Negrete were both taken to the hospital. Patino later learned that his brother Ulises had died from his injuries.

¶ 6    On August 11, 2009, Patino and Gonzalez went with the police to South Oglesby Avenue and West 104th Street, about three blocks north of the intersection where the shooting had occurred. At that location, Patino recognized the vehicle from which he had seen defendant firing. Patino also identified a photo of the car in open court as the car used in the shooting. Patino identified a photo of defendant as the shooter to the police.

¶ 7    Alejandra Gonzalez was walking north on South Calhoun Avenue with Patino, Negrete, and Ulises at approximately 8:25 p.m. on August 10, 2009. When they were at the intersection of 107th and Calhoun, Gonzalez heard Patino say to watch out for a car. She looked and saw an "older model ***, a four door, like a grayish, bluish, midnight blue color" car, which was traveling slowly west on 107th. After the car passed through a stop sign, Gonzalez heard gunshots coming from the driver's side of the car. She then saw a Caucasian male hand pointing a gun from the driver's side window toward them. She also saw the shooter's face for "[a] little more than half a minute" but she did not know who he was at the time. He was wearing a white T-shirt and no hat. Gonzalez identified defendant as the shooter in open court. She was three to five feet away from the car when she saw defendant's face, and nothing was blocking her view with Patino standing three or four feet behind her. Gonzalez heard four or five additional shots and the car kept moving west. When the shooting was over, she turned her attention to Ulises after he said he had been shot. Gonzalez rode in the ambulance with Ulises and she later learned that he had died.

¶ 8    Later, on August 11, 2009, Gonzalez went to 10431 South Oglesby Avenue with a police officer and Patino, where she identified the car that was used in the shooting. On August 12, 2009, Gonzalez identified defendant as the shooter in a lineup at the police station. Before viewing the lineup, a detective told Gonzalez that the suspect may or may not be in the lineup and that she was not required to make an identification. Gonzalez testified that she had seen defendant once or twice prior to the night of the shooting around the neighborhood. She did not recall when she had seen him before, but she never talked to him and had not been in the same place with him for more than a minute. Gonzalez never saw defendant leave the car and the car moved the entire time the shooting was occurring. Gonzalez saw defendant for the first time when Patino told her to watch out for the car. When Gonzalez spoke with the detectives, she believed she told them that she saw the shooter's face before the shooting began. No one told her who to identify in the lineup or what defendant looked like before she viewed the lineup. Gonzalez also testified that she did not identify defendant because Patino told her defendant was the shooter, she identified defendant because he was the person she "saw with [her] own two eyes."

¶ 9    Israel Negrete substantially corroborated the testimony of Patino and Gonzalez. At about 8:25 p.m. on August 10, 2009, Negrete was walking a dog with Patino, Gonzalez, and Ulises toward 107th and Calhoun. As they reached the intersection, Patino told them to watch out for a car that Negrete described as having four doors and being a "bluish-gray color." Negrete looked at the car for "a couple of seconds," but did not pay attention, then turned around because the dog pulled on the leash he was holding. Negrete then turned and started walking the dog back, and then he heard gunshots. He turned and saw the gunshots were coming from the driver's side of the car because he saw flashes. He heard two gunshots, looked back, started running without

4

paying attention to see who was shooting, and heard "like six" more shots. Negrete could not see the face of the person shooting from the car. He ran toward a tree and tried to take cover, but he was shot. After the car drove away, Negrete realized he had been shot and he sat down on the curb. He saw Ulises was on the ground. He subsequently was taken to the hospital in an ambulance. Negrete suffered gunshot wounds in each arm and his ribcage and he had two surgeries as a result of his wounds.

¶ 10    Maria Tellez testified that on August 10, 2009, she was living on the 10600 block of South Hoxie Avenue. At approximately 8:25 p.m., she heard gunshots coming from the direction of 107th and Calhoun. She heard four shots, a pause, and then three more shots. Tellez went to her back door and looked west, where she saw a Caucasian male get into the driver's side of a "light-colored vehicle" on the corner of 107th and Calhoun. The car then drove west toward Bensley Avenue, where the Trumbull Park Homes are located.

¶ 11    At approximately 8:32 p.m. on August 10, 2009, Officer Assata Olugabala and her partners received a "shots fired call" in the vicinity of 107th and Calhoun. When they arrived at the scene, she observed two injured Hispanic males and a few other witnesses in the area. Officer Olugabala spoke with Gonzalez at the scene and Gonzalez told the officer about the direction the car was headed and gave a description of the man involved in the shooting. Officer Olugabala was present when her partners spoke with Patino, who provided a name and nickname for the shooter and gave a description of the vehicle involved. After receiving information from the witnesses, a flash message was sent advising officers to look for a Caucasian man named Michael Temple who had a nickname of White Mike.

¶ 12    At about 8:30 p.m. on August 10, 2009, Officer Lorenzo Colucci responded to a call of shots fired near 107th and Calhoun. He received information on the radio including a description

of the vehicle used in the shooting, that the vehicle fled westbound after the shooting, and the name of the suspect wanted in connection with the shooting. Colucci obtained the "last whereabouts" of the suspect, which was on the "105th block of South Yates [Avenue]." At approximately 8:45 p.m., Colucci proceeded to the area of 104th and Oglesby, near the suspect's last whereabouts, where he saw a vehicle matching the description of the offender's vehicle, a 1995 Oldsmobile Cutlass Sierra with the windows rolled down. The vehicle identification number was 1G3AJ55M1S6352272. No one was inside the car. Colucci gave the plate number and location of the vehicle to 911 dispatch, and then learned the registered owner of the vehicle was Sharon Monok and that she resided at the same place that was listed as the residence listed for the offender they were seeking.

¶ 13    The State then introduced a certified copy of the vehicle record for the recovered 1995 Oldsmobile Cutlass, with vehicle identification number 1G3AJ55M1S6352272, reflecting a single owner by the name of Sharon Monok. An evidence technician collected material for DNA testing from multiple locations in the interior of Monok's vehicle. Humidity interfered with collecting prints from the vehicle. Forensic DNA evidence showed that defendant's DNA was found on swabs from the steering wheel, gearshift, armrest, and interior driver's side door handle. A trace evidence analyst tested the vehicle for gunshot residue, which was negative. The analyst explained at trial that if a shooter had his arm extended out of the driver's side window of the vehicle, the "cloud of smoke would have to be drawn back into the vehicle and deposited on the areas in which the collecting officers had collected from. If it does not come back in the car, I would not expect to find it on the sample stubs."

¶ 14    On August 11, 2009, Detective Brian Forberg went to the area of 104th and Oglesby, where he met Patino and Gonzalez after responding units had located a vehicle matching the

6

description of the offender's vehicle provided by the witnesses. Patino and Gonzalez were brought together in the same car, and then taken out of the car individually to view the vehicle. Patino and Gonzalez both identified the vehicle to Detective Forberg and his partner as the vehicle used during the shooting. Later, Detective Forberg interviewed Patino to get his statement and to show him a photo of defendant so he could make a formal identification. He showed Patino a single photo of defendant, not a photo lineup, "[b]ecause of his knowledge" of defendant. Patino identified defendant as the shooter.

¶ 15    Detective Forberg subsequently went to the address where the recovered vehicle was registered, 1449 South State Street in Calumet City, Illinois, with two other detectives, Detective Eberle and Detective Deneen, and was present when defendant was taken into custody. Detective Forberg also briefly spoke with defendant's mother Sharon Monok. He later went to the auto pound to test drive the vehicle based on statements from Monok at the time of defendant's arrest. He drove the vehicle and found it was operable. On August 12, 2009, Detective Forberg was present when Gonzalez viewed a lineup and identified defendant as the man who shot her friends.

¶ 16    After the State rested, defendant moved for a directed verdict, which the trial court denied.

¶ 17    Defendant's mother Sharon Monok testified for the defense that in August 2009, she lived at 1449 South State in Calumet City, Illinois, and owned a 1995 Oldsmobile Cutlass Sierra. She last saw the vehicle on the morning of August 9, 2009, when she came home from work. When she left for work on the afternoon of August 10, 2009, the vehicle was not at her home. After speaking with defendant, Monok believed her car was near Trumbull Park and that it was not working, but she did not verify the car was at that location or that it was inoperable.

Defendant was at home when she left for work, and he was asleep on the couch when she came home around 3 a.m. on August 11, 2009. At approximately 4:30 a.m. on August 11, 2009, police officers came to Monok's home and arrested defendant.

¶ 18    Following deliberations, the jury found defendant guilty of two counts of first degree murder arising from the murder of Ulises, one count of attempted first degree murder of Negrete, and one count of aggravated battery with a firearm of Negrete. The jury also found that defendant personally discharged a firearm during the commission of the offenses. The trial court subsequently sentenced defendant to 45 years imprisonment on each first degree murder conviction, with those sentences to run concurrently, 31 years imprisonment for attempted first degree murder and 30 years for aggravated battery, with those sentences to run concurrently with each other and consecutively to the first degree murder sentences. Defendant received an aggregate sentence of 76 years in the Illinois Department of Corrections.

¶ 19    On direct appeal, defendant raised multiple issues, arguing that: (1) the trial court erred by admitting prior consistent statements or, in the alternative, defense counsel was ineffective for failing to object to the State eliciting prior consistent statements from its witnesses; (2) the trial court erred by admitting improper hearsay from the testifying police officers; (3) the prosecutor improperly distorted the burden of proof and unfairly bolstered its own evidence during rebuttal argument; (4) the identification evidence was insufficient to prove defendant guilty beyond a reasonable doubt; and (5) the mittimus must be corrected because defendant was improperly convicted for more than one offense arising out of the same acts. *Temple*, 2014 IL App (1st) 111653, ¶ 1. This court affirmed defendant's convictions and sentences for one count of first degree murder and one count of attempted murder, but we vacated the convictions and sentences for one count of first degree murder and aggravated battery with a firearm. *Id.* ¶ 94.

8

¶ 20    In September 2015, defendant filed his initial postconviction petition, prepared by counsel. In April 2016, defendant, through counsel, filed his first amended postconviction petition. Defendant raised three claims: (1) he was actually innocent based on newly discovered evidence from three witnesses stating that the offenses were committed by a Caucasian male known as "Worm;" (2) his trial counsel was ineffective for failing to present his sister and mother as alibi witnesses; and (3) his trial counsel was ineffective because at the time of defendant's trial, his counsel suffered from alcoholism, drug addiction, narcissistic personality disorder, and was under investigation by the Attorney Registration and Disciplinary Commission (ARDC). The verification page for the petition listed postconviction counsel's name, but was unsigned.

¶ 21    In March 2017, the State moved to dismiss defendant's first amended postconviction petition, arguing that the petition failed to comply with the pleading requirements of the Post-Conviction Hearing Act (Post-Conviction Act) because the verification affidavit was neither signed, nor notarized. See 725 ILCS 5/122-1(b) (West 2016) (requiring a petition "verified by affidavit").

¶ 22    In January 2019, defendant filed a second amended postconviction petition, raising the same three claims. The verification affidavit was now sworn and signed by defendant. In support of his actual innocence claim, defendant alleged that three potential witnesses, Cassandra Norman, Chamille Sopys (Sopys), and Ajnat Sopys (Ajnat), would testify that they witnessed the shooting, saw the shooter, and that the man was known to them as "Worm," whose real name was James Louis Lewandowski, who was deceased. In his first amended petition, defendant attached affidavits from Norman and Sopys, but Sopys's affidavit was not attached to the second amended petition. No affidavit from Ajnat was included in any filed petition.

¶ 23    Norman stated in her affidavit that at approximately 8:25 p.m. on August 10, 2009, she was standing in front of her mother's house, located in the 10700 block of South Bensley Avenue, and Sopys and Ajnat were nearby. She then heard gunshots and saw a gray, four-door car speed past. Norman saw a Caucasian male and two African American males in the car, with the Caucasian male driving and hanging out of the window. She knew the Caucasian male from the neighborhood as "Worm," but did not know his name. She identified an attached photograph as "Worm," the man she saw driving the car just after she heard the gunshots. She did not testify or come forward earlier because she was not contacted by the police and she was afraid of retaliation. Having reviewed the record, we note the photograph is of little use if any since there are no facial features able to be viewed.

¶ 24    In her affidavit attached to the first amended petition, Sopys stated that at approximately 8:25 p.m. on August 10, 2009, she was walking towards 107th Street, near the intersection of 107th Street and Calhoun Avenue, when she saw a shooting. The shooter was driving a "grayish" colored car and was a Caucasian man known to her from the neighborhood as "Worm." She saw Worm put his arm out of the window and shoot at two men and a girl, who was walking a dog. Sopys stated that Worm closely resembled defendant, whom she also knew from the neighborhood. She did not testify or come forward earlier because she was not contacted by the police and was afraid of retaliation. She identified the same photograph as the man she knew as "Worm."

¶ 25    Defendant also alleged that his trial counsel was ineffective for failing to present an alibi defense. The petition stated that defendant's mother and sister would have testified that both were at home with defendant at the time of the shooting and counsel was aware of defendant's alibi, but failed to present this testimony. Counsel had no strategic reason for failing to present

their testimony and had their testimony been presented, there was a reasonable probability that defendant would have been acquitted at trial. In support of this claim, defendant attached affidavits from his mother Monok and his sister Dawn Temple. In Temple's affidavit, she stated that at approximately 8:25 p.m. on August 10, 2009, she was in her house at 1449 State Street in Calumet City, Illinois, with defendant and her mother Monok. She provided this information to a State's Attorney when defendant was arrested as well as defendant's attorney. Monok's affidavit mirrored Temple's affidavit, stating that she was at her house at approximately 8:25 p.m. on August 10, 2009, with defendant and Temple. She provided this information to a State's Attorney when defendant was arrested as well as defendant's attorney.

¶ 26    Defendant further alleged that his trial counsel was ineffective based on claims before the ARDC that counsel suffered from alcoholism, drug addiction, and narcissistic personality disorder. The petition stated that counsel had substantial problems with alcoholism and depression at the time he represented defendant and he and his family were not aware of these problems that could affect counsel's representation of defendant. The petition asserted that "[t]hese problems negatively affected" counsel's representation of defendant and there was a reasonable probability that had counsel not been affected by these problems, he "would have provided competent representation and there [was] a reasonable probability of a different outcome."

¶ 27    Defendant attached an ARDC complaint filed against his trial counsel in August 2014, which set forth eight counts from multiple clients claiming that counsel received payment for representation, but failed to perform any work on the cases and neglected the clients. Defendant was not included as one of the clients in the complaint. In the subsequent disciplinary petition to the supreme court, respondent consented to discipline suspending him from the practice of law

for one year, with the suspension stayed for a two-year period of probation including the payment of restitution. The petition stated that a forensic psychiatrist retained by the ARDC evaluated respondent and diagnosed him with depression and alcohol dependence, which were in remission. The psychiatrist also diagnosed counsel with narcissistic personality traits, which contributed to counsel's misconduct. In September 2015, the supreme court entered an order suspending counsel from the practice of law for one year and until further order of the court, with the suspension stayed by a two-year period of probation, subject to a detailed list of conditions. A subsequent disposition order, dated April 11, 2016, stated that trial counsel was suspended from the practice of law "for a specified period of time and until further order of the Court."

¶ 28    In June 2019, the State moved to dismiss defendant's second amended postconviction petition, arguing that defendant's claims were refuted by the record and he failed to make a substantial showing that his constitutional rights were violated. Defendant filed a response to the motion in July 2019.

¶ 29    In July 2020, the trial court granted the State's motion to dismiss in a written order. In considering defendant's claim of actual innocence, the court found that the affidavits from Norman and Sopys failed to detail a fear of retaliation that prevented them from coming forward such that they could constitute newly discovered evidence. The court also concluded the affidavits were not of such a conclusive character that the outcome would likely be different on retrial. The court declined to find ineffective assistance and found that trial counsel chose to attack the credibility of the State's eyewitnesses and their ability to observe defendant. The court concluded that trial counsel's decision not to present alibi witnesses was a reasonable trial strategy. The court pointed out that Monok's affidavit was refuted by her trial testimony that she was at work from the afternoon of August 10, 2009, until the early morning of August 11, 2009.

12

The court also noted that the statements by Monok and Temple that they provided the alibi to a State's Attorney when defendant was arrested was refuted by Detective Forberg's testimony that he and other officers arrested defendant. Finally, the trial court observed that defendant offered no reason for alleging how his trial counsel was ineffective based on the ARDC complaints and held that defendant failed to set forth a claim of ineffective assistance of counsel.

¶ 30    This appeal followed.

¶ 31    The Post-Conviction Act (725 ILCS 5/122-1 through 122-8 (West 2016)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 32    At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). If the circuit court advances the petition to the second stage, counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2016)) and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2016)). At this stage, the circuit court must determine whether the petition and any

13

accompanying documentation make a substantial showing of a constitutional violation. See *Coleman*, 183 Ill. 2d at 381. If no such showing is made, the petition is dismissed. "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the circuit court dismisses the petition at that stage, we generally review the circuit court's decision using a *de novo* standard." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2016).

¶ 33    Defendant first argues that he made a substantial showing of a claim of actual innocence based on newly discovered evidence that the shooting was committed by another man. Specifically, defendant relies on the affidavits from Cassandra Norman and Chamille Sopys, in which each identified the shooter as an individual known as "Worm." The State responds that the affidavits are not of such a conclusive character that the result of the trial would probably be different, nor do they constitute newly discovered evidence.

¶ 34    "The due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence." *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; see also *People v. Jackson*, 2021 IL 124818, ¶ 41. "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.*

14

Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* This court "must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *People v. Sanders*, 2016 IL 118123, ¶ 47. Since defendant's petition was dismissed at the second stage, we review the judgment of dismissal to determine whether, after taking as true all of defendant's allegations that are not refuted by the record, those allegations establish or "show" a constitutional violation. See *People v. Domagala*, 2013 IL 113688, ¶ 35. In other words, the substantial showing of a constitutional violation that must be made at the second stage is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle the defendant to relief. *Id*.

¶ 35    Defendant asserts that the affidavits from Norman and Sopys are sufficient to establish a claim of actual innocence. In her affidavit, Sopys stated that she was walking towards 107th Street, near Calhoun Avenue, when she saw a shooting. She knew the driver of the car from the neighborhood as "Worm." She saw Worm put his arm out of the car window and shoot at two men and a girl, who was walking a dog. Sopys further stated that Worm closely resembled defendant, whom she also knew from the neighborhood. She did not testify or come forward earlier because she was not contacted by the police and was afraid of retaliation. Similarly, Norman stated in her affidavit that she was standing in front of her mother's house in 10700 block of South Bensley Avenue with Sopys and Ajnat nearby. She heard gunshots and then saw a gray car speed past. There was a Caucasian male driving with two African American males in the car. She recognized the driver from the neighborhood as "Worm," but did not know his

15

name. Norman did not mention defendant. Like Sopys, she did not testify or come forward earlier because she was not contacted by the police and was afraid of retaliation.

¶ 36    Although defendant asserts in both his petition and his brief that his newly discovered witnesses would testify that "Worm" was a man named James Louis Lewandowski, neither affidavit identified Worm's given name. Norman specifically stated that she did not know his name. No supporting evidence was provided to establish Worm's given name. Defendant also states that Lewandowski is deceased, but no evidence was provided to support this statement. Section 122-2 of the Act provides, "The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). The purpose of section 122-2 is to show a defendant's postconviction allegations are capable of objective or independent corroboration. *People v. Hall*, 217 Ill. 2d 324, 333 (2005). It is the defendant's burden to support the allegations with affidavits, records, or other evidence that contains specific facts. *People v. Jackson*, 213 Ill. App. 3d 806, 811 (1991). Unsupported or conclusory allegations, in either the petition or the defendant's affidavit, are not enough to mandate an evidentiary hearing. *Id*. Absent any evidence capable of corroboration that "Worm" is Lewandowski, we will not consider this allegation in our review of defendant's actual innocence claim.

¶ 37    Because we find it dispositive, we begin our review of the affidavits from Norman and Sopys to determine whether they satisfy the conclusive character requirement for actual innocence. The conclusive character of the new evidence is the most important element of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47. "[T]he conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id*. ¶ 56. "Probability, rather

than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id*. ¶ 48.

¶ 38    Taken as true, we find the affidavits are not of such conclusive character as to undermine this court's confidence in defendant's guilt. Sopys stated that she witnessed the shooting while near the intersection of 107th Street and Calhoun Avenue and recognized the shooter as someone she knew from the neighborhood as "Worm." She also stated that "Worm" closely resembled defendant, whom she also knew from the neighborhood. As noted above, Sopys did not identify Worm's given name. While Sopys stated in her affidavit that she saw Worm fire at two men and "a girl," who was walking a dog, the trial testimony differed from Sopys' description. The witnesses testified that three men, Patino, Ulises and Negrete, and one woman, Gonzalez, were walking together and Negrete testified that he was walking the dog. Norman heard the shooting and then saw a car speed past on South Bensley Avenue. She recognized the driver as someone she knew from the neighborhood as "Worm." Norman did not mention defendant in her affidavit and explicitly stated that she did not know Worm's given name.

¶ 39    In contrast, the trial evidence was specific and detailed regarding defendant's identification and corroborated his involvement in the shooting. Patino and Gonzalez both testified that they had the opportunity to observe the shooter and identified defendant as the shooter. Patino told the police that defendant was the shooter by name immediately thereafter and then identified a photograph of defendant as the man Patino had seen firing the gun. Gonzalez identified defendant as the shooter in an in-person lineup. Patino, Gonzalez, and Negrete all testified to similar descriptions of the vehicle that was used in the shooting. On the night of the shooting, police located a vehicle that matched the provided descriptions near the area where the shooting occurred. Patino and Gonzalez viewed the vehicle later that same night

and separately identified it as the car that was used in the shooting. The testimony of Patino, Gonzalez, and Negrete was also corroborated by Tellez, who testified she heard shots, then went to her back door and saw a Caucasian man getting into the driver's side of a light-colored vehicle at the same intersection where the shooting occurred. Additionally, the physical evidence corroborated the witness testimony. The vehicle identified was registered to defendant's mother, and defendant's DNA was found on the steering wheel, gearshift, driver's side interior door handle, and armrest of the vehicle.

¶ 40    After viewing the supporting affidavits when considered along with the trial evidence, we do not find the new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. The supporting affidavits provide vague statements identifying the shooter by nickname as someone known from the neighborhood. Sopys description of the shooting slightly differs from the actual events, which involved three men and one woman, with Negrete holding the dog's leash during the shooting. In considering the identifications, Patino and Gonzalez identified defendant shortly after the shooting, with Patino providing defendant's name to the police. In contrast, Sopys and Norman identified "Worm" as the shooter more than six years after the shooting. Further, both affidavits offer only general details of their ability to see the shooting or vehicle immediately thereafter. Sopys gave a general location that she was "walking towards 107th Street near the intersection of 107th and Calhoun," but does not state where she was such that she could view the shooting. Norman was a block away on Bensley Avenue when she heard the shooting and saw a car speeding past but was still able to identify the driver was Worm. Norman also stated that Sopys was "nearby," which adds to vagueness of Sopys's ability to view the shooting. Both Patino and Gonzalez detailed their position and ability to observe defendant as the shooter while walking north on Calhoun

18

Avenue.

¶ 41 Given the significant witness testimony and corroborating physical evidence presented at trial, these affidavits fail to set forth a substantial showing of a claim of actual innocence where the affidavits were not of such a conclusive character to probably change the result on retrial. It is clear from our review of the entire record, the evidence of defendant's guilt was powerful, compelling, and overwhelming. We cannot find that the supporting affidavits place the trial evidence in a different light such that this court's confidence in the outcome has been affected. Accordingly, defendant's claim of actual innocence was properly dismissed at the second stage of proceedings.

¶ 42 We next consider defendant's claims of ineffective assistance of trial counsel. Specifically, defendant contends that his trial counsel was ineffective because (1) counsel failed to present alibi testimony from his mother and sister; and (2) counsel's personal and professional issues, as alleged in an ARDC complaint, rendered counsel's performance deficient.

¶ 43 Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331

19

(2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id.*

¶ 44    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 45    Defendant first contends that his trial counsel was ineffective for failing to present his sister as an alibi witness at trial. The State maintains that defendant cannot establish that trial counsel provided deficient representation because counsel made a strategic decision to attack the credibility of the State's witnesses and their identification.

¶ 46    Trial counsel based his defense on the validity of the identifications and questioned the witnesses' ability to identify defendant. Counsel cross-examined Patino extensively about his identification of defendant. Counsel asked when Patino had last seen defendant and Patino responded that he had not seen defendant since elementary school which was about three or four years prior to the shooting. Counsel further asked where Patino had last seen defendant, pointing out that defendant would have been too old for elementary school. Patino admitted that defendant was not going to elementary school with him, but had seen defendant across from his school playground. Patino did not talk to defendant and was not friends with him. According to

20

Patino, he had "no social life connection" with defendant. Counsel also questioned Patino about whether defendant was clean shaven or if he had a beard at the time of the shooting. Patino answered that defendant did not have a beard, but then counsel showed Patino the picture he identified to police, in which defendant had a beard. Counsel asked if that was how defendant looked the day of the shooting and Patino answered in the affirmative. Counsel also questioned Patino about his ability to observe defendant and the timeline from when he first saw the car to the shooting, including Patino's testimony that he was 40 to 45 feet away from the car.

¶ 47    Trial counsel also questioned Gonzalez's identification during cross-examination. He asked if she ever saw defendant before, she answered, "once or twice" and could not recall when the last time she had seen him. She had never spoken with him or been at the same location longer than a minute. Counsel pointed out that in contrast with Patino's testimony, Gonzalez testified that she was three to five feet away from the car when the shooting occurred and Patino was right behind her. During closing argument, counsel argued about these inconsistencies and their ability to identify defendant. Counsel further argued that the physical evidence did not corroborate the witness testimony, specifically the lack of gunshot residue on the car or defendant.

¶ 48    In contrast, defendant contends that counsel should have pursued an alibi defense with testimony from his sister. Since defendant has not argued his mother Monok's availability as an alibi witness on appeal, that specific claim has been forfeited. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

21

¶ 49    " 'Whether to call certain witnesses and whether to present an alibi defense are matters of trial strategy, generally reserved to the discretion of trial counsel.' " *People v. Jackson*, 2020 IL 124112, ¶ 106 (quoting *People v. Kidd*, 175 Ill. 2d 1, 45 (1996)). "Decisions about whether to call witnesses are generally considered matters of trial strategy and reserved to the discretion of trial counsel." *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 84 (citing *People v. Chapman,* 194 Ill. 2d 186, 231 (2000)). At this stage of the proceedings, we are to accept well-pleaded factual allegations of a postconviction petition and its supporting evidence as true unless they are positively rebutted by the record of the original trial proceedings. *Sanders*, 2016 IL 118123, ¶ 48.

¶ 50    As discussed above, both Monok and Temple stated in their respective affidavits that at approximately 8:25 p.m. on August 10, 2009, they were at home in Calumet City with defendant. Both women further stated that they provided this information to a State's Attorney present when defendant was arrested and also to trial counsel. However, both of these affidavits have been positively rebutted by the trial record. First, Monok was not at home that evening. She testified at defendant's trial that she was at work the night of August 10, 2009, leaving for the train at 4 p.m. and returning home at around 3 a.m. When she got home, defendant was asleep on the couch. Temple's affidavit is contradicted by Monok's testimony because Temple had stated that she was at home with Monok and Temple. Additionally, Detective Forberg's testimony refutes both affidavits' assertion that a State's Attorney was present at the time of defendant's arrest. At trial, the prosecutor asked Detective Forberg who accompanied him to defendant's house to place him under arrest, Detective Forberg answered that he went with two other detectives, Detective Eberle and Detective Deneen. There was no testimony anyone else, including a State's Attorney, was present at the time of defendant's arrest. Since these affidavits have been rebutted by the trial record, trial counsel acted reasonably in deciding not to pursue an alibi defense.

Accordingly, defendant has not made a substantial showing that his counsel's representation was deficient on this basis.

¶ 51    Further, as the State points out, defendant failed to offer any argument on appeal regarding how he was prejudiced by trial counsel's actions. In his second amended petition, defendant offers a single conclusory statement, "Had their testimony been presented, there is a reasonable probability, sufficient to undermine confidence in the outcome, that [defendant] would have been acquitted at trial." A petition alleging nonfactual and nonspecific assertions that merely amount to conclusions are not sufficient to warrant a hearing under the Act. *People v. Morris*, 236 Ill. 2d 345, 354 (2010). In his brief, defendant argues only that there was no evidence that his trial counsel made a strategic decision not to call Temple, who would have provided "a complete alibi that he was at home with her at the time of the shooting." As discussed, under *Strickland*, a defendant must show both that his counsel's representation was deficient and that he was substantially prejudiced by this deficiency. See also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). Since defendant has not offered any argument regarding how he was prejudiced, he has failed to set forth a substantial showing that his trial counsel was ineffective.

¶ 52    Finally, defendant asserts that his trial counsel was ineffective because counsel was suffering from personal and professional issues at the time of his representation. Specifically, defendant contends that his trial counsel's ARDC investigation, which disclosed substance abuse and mental health issues, created a conflict of interest in his representation of defendant. The State observes that defendant did not frame this ineffective assistance claim as a conflict of interest in his petition and contends that he may not reframe his claim on appeal.

¶ 53    " '[T]he question raised in an appeal from an order dismissing a post-conviction petition is whether the allegations in the petition, liberally construed and taken as true, are sufficient to invoke relief under the Act.' " (Emphasis omitted.) *People v. Jones*, 211 Ill.2d 140, 148 (2004) (quoting *Coleman*, 183 Ill. 2d at 388). We first review defendant's claim in his petition to determine if a conflict of interest was alleged.

¶ 54    Defendant's second amended petition alleged that at the time trial counsel represented defendant, counsel had a "substantial problem with alcoholism and depression." Defendant further alleged that he and his family were not aware at the time counsel was hired that counsel had these problems and that they could affect his representation. Defendant concluded that "these problems negatively affected" counsel's representation of defendant and there was a reasonable probability that had counsel not been affected "by these problems he would have provided competent representation and there [was] a reasonable probability of a different outcome." After reviewing the petition, we find that defendant did not allege a conflict of interest based on trial counsel's personal issues in his petition. He raised a general claim of ineffective assistance and he cannot attempt to reframe it as a conflict of interest. Because defendant's petition did not raise a conflict of interest, any argument on this ground has been forfeited. *People v. Pendleton*, 223 Ill. 2d 450, 475 (2006); *People v. Jones*, 213 Ill. 2d 498, 506 (2004); 725 ILCS 5/122-3 (West 2018). As the supreme court has admonished, this court does not possess the supervisory powers of the supreme court and cannot reach postconviction claims not raised in the initial petition. *Jones*, 213 Ill. 2d at 507.

¶ 55    Turning to defendant's general claim of ineffective assistance, defendant has failed to set forth any details of how trial counsel's personal and professional issues impacted his representation of defendant. The supreme court has held that a defendant cannot establish

24

ineffective assistance of counsel based on an attorney's unrelated problems with the ARDC. *People v. Szabo*, 144 Ill. 2d 525, 529-32 (1991). In that case, the defendant asked the supreme court to grant him a new trial solely on the basis of his trial counsel's problems with the ARDC. *Id*. at 529. The court noted the defendant's postconviction petition included "only two brief paragraphs alleging [counsel's] deficient representation." *Id*. The *Szabo* court further observed that the defendant's counsel did not appear before the ARDC until 10 months after the defendant's trial and the majority of the complaints arose after the defendant's representation. *Id*. at 530. The supreme court found that the record showed "competent representation" on the defendant's behalf, including engaging in extensive discovery, effective presentation and cross-examination of witnesses, filing and arguing motions before and during trial, and delivering a strong closing argument on the defendant's behalf. *Id*. at 531.

¶ 56    Here, defendant offered only vague, conclusory allegations that counsel's issues affected defendant's case and caused defendant to be prejudiced. As previously stated, a petition alleging nonfactual and nonspecific assertions that merely amount to conclusions are not sufficient to warrant a hearing under the Act. *Morris*, 236 Ill. 2d at 354. " 'A defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation.' " *People v. Deleon*, 227 Ill. 2d 322, 337 (2008) (quoting *People v. Pecoraro,* 175 Ill. 2d 294, 324 (1997)). Defendant's claim relies solely on speculation and conjecture without any details relating to counsel's representation. He has not alleged any details regarding how counsel's issues affected the case or caused him prejudice. While defendant attached a 2014 ARDC complaint and order, none of the counts in the complaint involved defendant, nor did he attach any evidence of his own ARDC filing. Additionally, none of the counts in the complaint were based on allegations that counsel had a substance abuse issue. Rather, the claims related to counsel's failure to

provide competent and diligent representation and to return unearned attorney fees. Defendant has not asserted that his counsel failed to prepare and present a defense at trial, nor that counsel received payment for work that was not performed. As the supreme court held in *Szabo*, defendant in this case cannot establish a claim of ineffective assistance based solely on unrelated issues before the ARDC. Absent any factual allegations involving his case, we find that defendant cannot establish that counsel's performance was deficient. See *Strickland*, 466 U.S. at 687. Accordingly, defendant has failed to make a substantial showing of ineffective assistance of trial counsel and the trial court properly dismissed this claim.

¶ 57    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 58    Affirmed.