2025 IL App (1st) 231762-U

No. 1-23-1762

SECOND DIVISION
September 9, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 10484 01 |
| | ) | |
| ANTHONY GONZALEZ, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the trial court's judgment denying defendant's motion for a new trial where the trial court's actions and rulings during the parties' closing arguments did not constitute an abuse of discretion, and the court properly found that the new evidence presented at the hearing was not of conclusive character.

¶ 2     Defendant Anthony Gonzalez appeals the trial court's denial of his motion for a new trial.

On appeal, he contends that the trial court should have granted his motion where defense counsel

was prevented from arguing during closing argument that the shooter "came from a black car," or

that burn marks would have been visible if the victim had been shot at close range, where the trial

evidence supported both statements. He also contends that a new trial is warranted where two new

witnesses testified at the hearing that defendant was not the shooter. For the following reasons, we

affirm.

¶ 3                                  I. BACKGROUND

¶ 4      Defendant was charged with attempted murder, aggravated battery with a firearm and

harassment of a witness under indictment number 19 CR 10484. The case proceeded to a jury trial.

¶ 5                                       A. *Trial*

¶ 6      At trial, Ulysses Jones testified that around 3 a.m. on June 30, 2019, he was walking home

along Chicago Avenue. He stopped at the gas station at Chicago Avenue and Lorel to get a snack.

While inside, he and defendant, who he referred to as Stuttamo, got into an argument. Jones had

known defendant for about seven or eight years as someone from the neighborhood. They did not

socialize and saw each other about twice a month. Jones identified defendant in court as Stuttamo.

¶ 7      At the gas station, defendant called Jones "bogus" for testifying in a murder case on behalf

of Otis Sanders, who was Jones' cousin. The defendant in that case was found guilty. Jones asked

defendant why he was bothering him about the case. They continued to discuss the matter outside

of the gas station. Defendant continued to call Jones "bogus," saying that Jones should not have

testified. Jones told defendant "that was almost ten years ago. Let that go."

¶ 8      Outside the gas station, Jones observed a group of people he recognized from the

neighborhood. As he walked towards the Lorel side of the gas station, defendant continued to call

him "bogus," telling him that he should have "left it in the street." Jones felt intimidated by

defendant. After telling defendant to leave him alone, Jones took his "eyes off of" defendant and

began socializing with someone else. Defendant then walked away. As Jones spoke with the other

person, he saw defendant walking towards him. Defendant again told Jones that he was "bogus" and shot him in the leg. Jones testified that he was about four to six inches away from defendant, face-to-face, when defendant shot him. He tried to run, but defendant shot him again in the back. Jones fell between some vehicles and defendant fled. Jones was transported to Mount Sinai hospital with a broken femur, three broken ribs, and a collapsed lung.

¶ 9      Later that day, Jones spoke with Chicago Police Detective Thomas Conley at the hospital. He told Conley that defendant shot him. He described the shooter as wearing all black, "light skinned almost like Hispanic," with a tattoo on his face. Conley showed Jones a still photograph taken outside of the gas station. Jones identified a person depicted in the photo as defendant, and he identified himself in the photo as the person in the hoodie. Jones was wearing a gray and black jogging suit and a red "D. Rose" basketball jersey with a white t-shirt underneath. In the photo, defendant was standing directly in front of Jones.

¶ 10     Jones spoke with Conley the following day and again identified defendant as the shooter. On July 7, 2019, Jones viewed a photo array at the police station. Jones identified defendant as the person who shot him and signed the exhibit. In making the identification, Jones stated: "That's the guy that shot me."

¶ 11     At trial, Jones watched surveillance video recorded from the gas station at Chicago and Lorel Avenue on June 30, 2019. He identified himself in the video, and the exhibit was admitted and published. The video showed Jones wearing gray jogging pants and a gray top with a red shirt underneath. Defendant was in the video wearing all black with a hat and white gym shoes. Jones identified himself coming out of the gas station door with defendant visible in the video. Jones can be heard in the video telling defendant that he had nothing to do with the situation, and then defendant called Jones "bogus." The published video also showed defendant and Jones discussing

the cousin's case and Jones asking defendant to leave him alone. Jones explained that it happened years ago, and he asked defendant why he was asking about the case. Jones can be seen walking away as he and defendant were discussing the matter. The recording then showed Jones outside walking towards Lorel. Defendant was standing in front of Jones and talking. As they faced each other, defendant gestured with his hands.

¶ 12    At trial, Jones also viewed surveillance video taken from a nearby business on June 30, 2019. This recording showed defendant and Jones walking along Lorel Avenue. Jones and defendant were talking, and they stopped in front of a building. A black vehicle can be seen on the right side. Jones identified himself as the person closest to the vehicle, and he identified the individual next to him as defendant. Other people were standing six to seven feet away. Defendant can be seen walking up Lorel as Jones stood in front of a black vehicle.

¶ 13    Neither recording captured the actual shooting.

¶ 14    Jones testified that the day before he was shot, he had been drinking in the park around noon or 1 p.m. He slept on a bench until a "kid" slapped him on his head. Jones stated that he was sober when he woke up and he left the park to go home. Along the way, he stopped at the gas station and convenience store at Lorel and Chicago Avenue. Jones stated that he was sober when he reached the gas station.

¶ 15    On cross-examination, Jones confirmed that he was drinking in the park between 12 and 1 p.m. on June 29, 2019. He was in the park for seven or eight hours. He clarified that he was not drinking for several hours, he was only smoking marijuana. Counsel presented defendant's Exhibit No. 1, which was a video conversation Jones had with an assistant state's attorney (ASA) on July 9, 2019. In the video, Jones stated that he was kind of tipsy when he woke up.

¶ 16    Jones stated that he recognized Bruce Tripp in the video as a person he had known for a while. He also saw a woman from the neighborhood named Pat in the video. He did not recognize the tall individual with the dreadlocks.

¶ 17    Jones testified that he saw the shooter approach from the right, but he did not see a firearm. When asked whether he told first responders that the shooter "came from a black car," Jones clarified that he said the shooter "may have walked to a black car." When defense counsel asked Jones about his statement to the ASA, Jones agreed that he told the ASA that the shooter "possibly came from a black car." Jones explained, "[t]hat's the car that I seen [*sic*] him walk to, yeah." He could not see the exact vehicle defendant walked to, but he could see defendant walking towards black cars. Defense counsel asked Jones if he could see whether the shooter "did come from a black car." Jones responded, "[n]ot if he is on the other side of the street, no." Jones stated that defendant was four to seven inches from him when he was shot. He identified defendant from a photo array because defendant was the person who "stood in front of me and shot me, yes."

¶ 18    Jones acknowledged that the video did not show the actual shooting and that his testimony was based on his own recollection. Defense counsel noted that the video showed Jones "getting in [defendant's] face" at the gas station. Jones explained that he felt intimidated by defendant and wanted to "brace" himself for what might happen. He testified that in street language, being called "bogus" is considered a threat.

¶ 19    On redirect examination, Jones stated that he told the ASA he was sober when he walked to the gas station. He had also informed the police about Pat and Bruce Tripp. When Jones left the gas station, he was walking away from defendant and did not talk to him. Defendant then approached him and called him "bogus."

¶ 20    Detective Conley testified that on June 30, 2019, he was assigned to investigate an aggravated battery with a firearm that occurred at 754 North Lorel in Chicago. Conley observed cameras outside of a nearby gas station at 3553 West Chicago, and he inquired whether the cameras could have captured the incident. Although the cameras did not record the actual shooting, they did capture people running. Conley also saw cameras mounted on the west wall of a building across the street where New Mom Chicago was located. Conley was not able to view footage from those cameras at that time.

¶ 21    Conley interviewed Jones at Mount Sinai Hospital. Jones described the shooter as a male Puerto Rican or Hispanic, about 5 feet 10 inches to 6 feet tall and weighing 180 to 200 pounds, with light skin. Jones said that the shooter's nickname was Stuttamo and he was dressed in all black clothing. The next day, Conley returned to the gas station to download the video from the surveillance system. After obtaining the video, Conley returned to Mount Sinai Hospital to speak with Jones. Jones gave the same description of the shooter.

¶ 22    Conley watched the video and took a screenshot of the victim and a tall male Hispanic who was talking to the victim in the gas station parking lot. On July 3, 2019, Conley showed Jones the screenshot and Jones identified himself as the person wearing a light colored hooded sweatshirt. He identified the person facing the camera as Stuttamo. That person was wearing a dark colored t-shirt with a white image. The case was subsequently reassigned to another detective. Conley never viewed the recording from the New Mom Chicago surveillance cameras.

¶ 23    Chicago Police Detective David Williams testified that on July 5, 2019, he was reassigned to this investigation. Williams created a photo array, and another detective showed the photo array to Jones. From the array, Jones identified defendant as the shooter.

¶ 24    Williams learned that video was recovered from the New Mom Chicago surveillance camera on the southeast corner of Lorel and Chicago. The video showed the correct time while the gas station recording was approximately 12 minutes behind. Based on the two videos, Williams determined that the time of the incident was 3:17 a.m. Jones identified two possible witnesses, Bruce Tripp and a woman named Pat. Williams tried locating these witnesses, but he was unsuccessful. Detectives visited numerous addresses in an attempt to locate Tripp. On July 8, 2019, Williams learned that defendant had been arrested.

¶ 25    On cross-examination, Williams stated he made three attempts to locate Tripp on July 9 and July 10 in 2019. On re-direct examination, Williams stated that they did not attempt to locate Tripp after July 10th because defendant had been charged and the investigation was complete.

¶ 26    Dr. Mason Milburn testified that he was a surgeon at Mount Sinai Hospital in Chicago. He specializes in orthopedic trauma and performs 30 to 50 surgeries a month. On June 30, 2019, Dr. Milburn treated Jones for gunshot injuries to his left lower extremity and back. Jones required a chest tube to remove blood from inside his chest wall, and he suffered fractures to the 7th and 8th rib. The gunshot to his thigh caused his femur to break. Although Dr. Milburn observed an entry wound, he did not see an exit wound which meant that the bullet remained inside the body. Dr. Milburn performed surgery to place a titanium rod in the femur. He testified that a gunshot to the leg could be fatal if a massive hemorrhage occurred. A gunshot wound to the chest cavity could also be fatal.

¶ 27    On cross-examination, defense counsel asked Dr. Milburn if he noticed any burn marks around the entry wound on Jones' leg. Dr. Milburn answered, "Not that I recall." This exchange followed:

"[DEFENSE COUNSEL]: Typically if someone is shot at close range *** wouldn't there be burn marks around –

[ASA]: Objection.

[THE COURT]: Are you able to give an opinion about that at all, Doctor?

[WITNESS]: I'm not a ballistics expert.

[THE COURT]: That's his answer. Next question.

[DEFENSE COUNSEL]: In your experience?

[ASA]: Objection.

[THE COURT]: Sustained. That's not your field is it, Doctor, about burn marks?

[WITNESS]: No, sir.

[DEFENSE COUNSEL]: Nothing further, your Honor."

Dr. Milburn stated that he did not examine the gunshot wound to the chest. After Dr. Milburn's testimony, the State rested.

¶ 28    Eric Ellis testified for the defense. Ellis knew defendant and Jones through a person named "Tone." On June 30, 2019, around 2:00 a.m., Ellis planned to meet with Tone at the gas station on Chicago Avenue and Lorel so they could "slide on some females." He viewed a video which showed him with Tone. He identified himself as in the middle wearing all black, walking toward the apartment buildings. He could be seen in the video talking to a female on a porch. He identified Tone coming into the gas station in red shorts. The video showed people standing around and cars pulling into the area. Ellis stated that four to five minutes were missing from the video.

¶ 29    Ellis testified that he saw defendant and Jones "out there." Jones and defendant continued walking, and when they were about five feet away, Ellis observed defendant walk towards a gray SUV. Defendant entered the vehicle and left. Two minutes later, "a black guy with dreads started shooting" and everybody ran away. Ellis saw the shooter come from around a building on Lorel. He described the shooter as "caramel with long dreads," but he could not identify the shooter in

the video. Ellis testified that defendant was not the shooter and did not have a gun. He later learned that defendant "was looking for a witness that was out there that could help him." Ellis told defendant that he would be a witness and contacted defendant's attorney.

¶ 30 On cross-examination, Ellis acknowledged that an investigator from the state's attorney's office tried to speak to him. However, he did not speak to the investigator. Ellis had learned two months before trial that defendant was being charged in the case, but he did not speak to the police, nor did he tell anyone besides defendant's attorney that defendant was not the shooter. Ellis stated that he and defendant are friends, and that defendant has a speech impediment. He has known defendant and Jones for a couple of years.

¶ 31 On redirect, Ellis testified that he did not speak to the investigator because he did not know he had to speak with anyone else. Although Ellis' attention was focused on the young woman he was talking to, he did observe defendant leave.

¶ 32 The attorneys stipulated that there are 3 minutes and 45 seconds of footage missing from the video obtained from the gas station.

¶ 33 The defense rested.

¶ 34 In closing argument, the prosecutor outlined the elements for attempted murder and argued that the evidence at trial proved beyond a reasonable doubt that defendant was the person who shot Jones. She argued that Ellis' account of the shooting was not reliable because he was a biased witness. Although Jones was seen in the video recordings, the prosecutor noted that Ellis could not be clearly seen in the video. She argued that Ellis merely "pointed to a body over on Lorel. That could have been anybody. He came in today and he sold you a bill of goods. Don't buy it."

¶ 35 Defense counsel argued that Ellis was not impeached during his testimony while Jones was

drunk on the night of the incident. Counsel argued,

"He was very drunk to the point where he had to go ahead and pass out on a bench, but he wants us to believe, no, I was in this park from noon until – I mean, he woke up after 2:00 in the morning. So he is in there for well over two hours in this park and he only had one drink, and the whole point that he went to this park was to drink. That's what he said. So we know that's not true. So we know he was drunk. So his ability to observe is compromised. His ability to remember is compromised."

¶ 36 Defense counsel argued that, contrary to Jones' trial testimony, Jones told first responders that "the shooter came from a black car." The State objected and the trial court sustained the objection because Jones "denied that part." The trial court stated that "[i]f the jurors didn't hear it, they are not to consider it."

¶ 37 Later, defense counsel commented on Dr. Milburn's testimony about the lack of burn wounds on Jones. The State objected, and the following exchange occurred:

"[THE COURT]:  Objection sustained about the burn marks. [Dr. Milburn] wasn't qualified to say. Go on. Sustained.

[DEFENSE COUNSEL]: We didn't hear any testimony about any burn marks on Mr. Jones. Logic would have to dictate that if you're being shot at point blank, you're going to have some sort of burn mark. You're going to have an entrance wound and an exit wound, right? I mean the bullet has to go somewhere.

[ASA]: Objection.

[THE COURT]: Objection sustained about that.

[DEFENSE COUNSEL]: Your Honor, I'm saying what logic would dictate. I'm saying what my opinion of the case is.

[THE COURT]: Sustained."

Defense counsel continued his argument that Jones was shot from a distance. He told the jury,

"Why would the person shooting Mr. Jones walk right up on him like that? Why wouldn't he stand back a little bit? There is no evidence to show that he was shot at point blank range, which would go ahead and once again compromise his ability to observe.

Additionally, Mr. Jones did lie when asked if he was drunk. Why? Why would he lie? Come in here and tell the truth, right? You can't – you can't take some evidence or some testimony and say, well, I believe this but I won't believe that. Once a liar always a liar. You can't go ahead and nitpick what you want to go ahead and pick."

Counsel argued that Jones misidentified defendant as the shooter, and that Ellis' testimony was credible. He further argued that the State's attempt to discredit Ellis' testimony, on the grounds that Ellis was defendant's friend and he did not speak with the investigator, was insufficient to meet its burden.

¶ 38    In rebuttal, the prosecutor disagreed that Ellis' testimony was discredited only for those reasons. She argued that "you heard the words come from [Ellis'] own mouth. The defendant was looking for help because he was going to trial. He was looking for help, someone to get him out of the fact that he shot Ulysses Jones." Defense counsel objected. The trial court overruled the objection, stating that the "jurors can accept or reject it." The prosecutor continued, arguing,

"So what did [Ellis] do? He got up here to help his friend, the defendant, and that's why you can't believe [Ellis].

And you heard [Jones] tell you he has known the defendant, seen him six, seven, eight years he said one to two times a month. He was six to seven – the defendant was six to seven inches from the victim and he mistakes him?

You saw the surveillance video yourself, and you will see it again. You saw how close the defendant was to the victim. You can't mistake that. [Jones] can't mistake that this was the person that was in his face, the person harassing him about testifying in a case where his cousin was murdered. No, he can't mistake that with this defendant, the only face he saw close up in his."

\* \* \*

It's just important again to point out looking at [Ellis'] testimony versus [Jones.] [Ellis] has every reason to come in here and lie like I said. This is his friend. He said his friend was looking for a way out.

And defense counsel said that the State was not able to impeach him. Do you want to know why? He wouldn't talk to our investigators. He wouldn't talk to them and if \*\*\* [Ellis] is friends with the defendant, which he said he was, wouldn't he know that he was arrested for this case? He didn't come forward and tell anyone [and] supposedly two months before this trial he had found out that he was charged but yet they're friends. Again, makes no sense. This is why you can't believe what [Ellis] said on that stand."

¶ 39    The jury found defendant guilty of attempted murder and aggravated battery with a firearm but not guilty of harassment of a witness.

¶ 40                              B. *Post-trial Motion and Hearing*

¶ 41    Defendant filed a motion for a new trial. He filed an amended motion after locating eyewitnesses Alkendrick Dennard and Bruce Tripp.

¶ 42    In the amended motion, defendant alleged that the trial court erred when it sustained the State's objection to defense counsel's statement in closing argument that according to Jones' testimony, the shooter came from a black car. Defendant also alleged that the court improperly

sustained objections to counsel's statement that Jones' bullet wounds showed no evidence of burn marks.

¶ 43    Regarding the two witnesses, defendant alleged that Dennard was a new witness who had recently come forward with exculpatory testimony. Dennard's affidavit stated that Dennard was at the gas station with defendant and saw him leave the area in a SUV before the shooting occurred. Dennard saw the shooter and described him as a dark-skinned man in a red car.

¶ 44    Also attached to the amended motion was a "general affidavit" from Tripp. Tripp stated that he previously spoke with investigator Ronald Winters on October 10, 2022, and gave a statement about an incident that took place on June 30, 2019. His statement consisted of a summary drafted by Winters after a "phone video conference" with Tripp on October 10, 2022. The summary stated that on June 30, 2019, Tripp was at the gas station on Lorel. Tripp recalled seeing a man get shot. He told the investigator that the shooter was "in a little red car" and "looked to be a dark skin male." Tripp observed a lot of people around the gas station before the shooting, including defendant. He stated that defendant left the area in a SUV before the shooting, and that he did not see defendant with a firearm.

¶ 45    The amended motion also set forth defense counsel's pre-trial attempts to locate Tripp. Counsel first appeared on behalf of defendant on June 29, 2020. Over the next three years, counsel made several efforts to locate Bruce Tripp and secure him as a witness. On February 10, 2023, the trial court stated that it needed to set the case for trial, and if counsel did not have Tripp by the trial date, the case would proceed without him. Defense counsel responded, "but I do have to clarify [for] the record that I did look for him diligently, your Honor." The trial judge acknowledged counsel's efforts, stating "I know. No question about you. That's fine." Defendant alleged that defense counsel could not locate or secure Tripp to testify at trial.

¶ 46    Dennard and Tripp testified at the hearing on defendant's amended motion for new trial. Dennard testified that he "grew up" with Jones and defendant. In the early morning hours of June 30, 2019, Dennard was walking to the gas station at Lorel and Chicago Avenue when he saw Jones arguing with defendant. Dennard testified that Jones and defendant "went their separate ways after that." Dennard was on the corner of Chicago and Lorel when he heard shots. He did not know where the shots came from, nor did he see who was shot. He did not see the shooter. Dennard testified that he saw defendant leave the area in a red van about 10 minutes before the shots. He learned that defendant was charged with the shooting about two-and-a-half months prior to his testimony. After the shooting occurred, Dennard did not go to the police, nor did he tell defendant's attorney or defendant what he had observed. One of his friends reached out to him to talk about the events of that night. Dennard testified that he saw his face in the video.

¶ 47    On cross-examination Dennard stated that on the night of the shooting, he was close to the intersection of Chicago Avenue and Lorel near the gas station building. He could see defendant walking along Lorel Avenue. In June of 2019, Dennard knew that Jones had been shot but he did not know that defendant's name was "up in it." He only recently learned that defendant was charged with the shooting because he had been living in Milwaukee. Dennard testified that he grew up with defendant and remained in contact with him. Marcus Sensor told him that defendant needed his help because defendant was found guilty. Defendant's family also reached out to him.

¶ 48    Bruce Tripp testified that he lived on the west side of Chicago for most of his life. Jones was one of his closest friends. Two months after Jones was shot, Tripp was shot in the same area. Tripp then moved to Champaign and has lived there for the past two years.

¶ 49    Tripp stated that he saw Jones in the early morning hours of June 30, 2019. Jones was at the gas station, and he and Jones were talking. A "light-skinned dude with dreadlocks" then "rolled

up" on Jones and Tripp, got out of the car, and fired at them. Tripp testified that the shooter was targeting him. However, he was not shot and the gunfire hit Jones. Tripp testified that defendant was not the shooter and that he did not see defendant that night. Tripp and Jones were in front of a building next to the gas station when Jones was shot.

¶ 50 On cross-examination Tripp testified that he knew defendant because they both worked at "Clean Slate." They were coworkers, not friends. He did not know how long he had known defendant. Tripp did not recall seeing defendant during the early morning hours on June 30, 2019. He spoke with investigator Winters on October 10, 2022, but did not recall telling Winters that he had seen defendant on June 30, 2019. Tripp testified, "I know I ain't seen him. I told you I got shot up. I met that man at work. What you want me to say?" Tripp was at the gas station with Jones and had been "kicking it" with him all day. They smoked cigarettes and "weed" together. Tripp testified that he had been "shot up[,]" had bad seizures and was hospitalized for a long time.

¶ 51 Tripp reiterated that a light skinned man with "dreads" got out of a car and shot Jones. The man fired at both of them and Tripp would have been hit if he had not run away. Tripp testified that he had been shot before in that same area by the gas station, so he "got out of there." He testified that the person who fired the shots was named "D" or "D-Boy." Tripp knew the shooter and was "scared of him too because he got people." The police had asked him, "was [*sic*] you out there?" He told them that he did not know and left. He did not tell the police that "D" was the person who shot Jones.

¶ 52 On redirect, Tripp testified that when he spoke to Winters, he did not know Winters was from defense counsel's office. After giving the statement to Winters, Tripp moved to Champaign. He did not tell Winters that he was moving. He did not receive any subpoenas from defense counsel

when he was in Champaign. A year ago, Tripp learned from his sister that defendant was on trial for attempted murder. Tripp knew the guy who shot at him and Jones, and he described the shooter as a light-skinned "dude" with dreadlocks.

¶ 53 The trial court denied defendant's motion for a new trial. The court found that defendant had received a fair trial. Regarding the new witnesses, it determined that Tripp's testimony contradicted the statement he gave to Winters on whether he saw defendant at the gas station before the shooting, as well as his description of the shooter. The court explained:

"The statement of Bruce Tripp, he can't wait to testify and already did. According to him today, Tripp was also a victim of attempted murder. He is with [Jones.] A car pulls up. According to his testimony today, it's a light-skinned guy with dreadlocks. According to the statement to the investigator, it looked like a dark-skinned male. A lot of people are around. A lot of people are around before the shooting, including [defendant.] His testimony today is [defendant] who? I never saw him.

As far as the surveillance of the gas station, the video shows [defendant] was there, but according to Tripp, he never saw [defendant.] And then he saw [defendant] leave before the shooting.

According to him today, he didn't see Gonzalez at all until after the shooting leaving, and he, himself, was the victim of attempted murder ***."

The trial court did not believe Tripp's testimony that he, along with Jones, was the target of gunfire that evening. The court found Tripp's testimony at the hearing "outrageously ridiculous. Not worth the paper it would have been written on." The court similarly found Dennard "not credible" as a witness.

¶ 54    Noting that neither witness provided much detail about the circumstances of the shooting, the court found "no basis whatsoever" to grant a new trial where Jones credibly testified about the shooting. Although Tripp and Dennard would have testified about the shooter being a person in a vehicle, the trial court found that the "jurors heard about the testimony of the other guy who was there, claims that the shooter was in the car. Someone comes in the car. The jurors heard it. They were only out an hour and 20 minutes. They obviously didn't believe it." The trial court concluded that even if Tripp and Dennard had testified at trial, the outcome would not have been different.

¶ 55    After hearing arguments in aggravation and mitigation, the trial court sentenced defendant to 31 years in the Illinois Department of Corrections.

¶ 56    This appeal follows.

¶ 57                                    II. ANALYSIS

¶ 58                                A. *Closing Argument*

¶ 59    Defendant first contends that the trial court improperly limited defense counsel's closing argument, thus preventing him from fully discrediting Jones' testimony about the shooting. It is well-established that defendant has a fundamental right to make a closing argument before the fact finder, regardless of the strength of the State's case. *Herring v. New York*, 422 U.S. 853, 858 (1975). This right is derived from defendant's sixth amendment right to assistance of counsel and his basic right to make his defense. *Id*. at 858-59. The Supreme Court made clear, however, that a defendant does not have the right to "uncontrolled" or "unrestrained" closing argument. *Id*. at 862. Rather, the trial court is given great latitude in limiting the scope of closing argument. *Id*. We review the trial court's limitation of defense counsel's closing argument for an abuse of discretion. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 105. Since the scope of closing argument is left largely to the trial court, we will make every reasonable presumption that the court properly

exercised its discretion. *People v. Harris*, 132 Ill. 2d 366, 391 (1989). An abuse of discretion occurs when the trial court's determination is arbitrary, fanciful or unreasonable, or where no reasonable person would agree with the trial court's position. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 60    Defendant contends that the trial court abused its discretion when it prevented his counsel from arguing that (1) Jones stated the shooter "came from a black car," and (2) the lack of burn marks on Jones' leg indicated he was not shot "at point blank" range. Defendant argues that the "black car" statement was supported by Jones' testimony at trial, and that the burn mark comment was a reasonable inference drawn from Dr. Milford's testimony.

¶ 61    Defendant preserved his claims of error because he objected to the challenged comments at trial and included the issue in his post-trial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. We find, however, that no abuse of discretion occurred.

¶ 62    During closing argument, defense counsel remarked that Jones said, "the shooter came from a black car." Defendant claims that, in sustaining the State's objection, the trial court misstated the evidence when it found Jones had "denied" saying the shooter came from a black car. While Jones did not explicitly deny making that statement, our review of the record confirms that Jones never testified that the shooter "came from a black car."

¶ 63    Jones' testimony at trial was that the shooter "*possibly* came from a black car." He then stated that the shooter "may have walked to a black car." When defense counsel asked Jones about his statement, Jones agreed that he said the shooter "possibly came from a black car" and explained, "[t]hat's the car that I seen [*sic*] him walk to, yeah." When asked whether he could see if the shooter "did come from a black car," Jones responded, "[n]ot if he is on the other side of the street, no."

¶ 64 Jones' testimony that the shooter "*possibly* came from a black car" indicated that he was unsure whether the shooter "came from a black car." In fact, considering Jones' testimony as a whole, the reasonable inference is that Jones did not actually observe the shooter arriving in any vehicle. He agreed that the shooter *possibly* came from a black car only because he had seen defendant walk towards a black car after the shooting.

¶ 65 A comment on evidence during closing argument is proper if it is supported by direct evidence or is a fair and reasonable inference from the evidence presented. *People v. Mullen*, 141 Ill. 2d 394, 404 (1990). Since there was no evidence that Jones said the shooter "came from a black car," the trial court's decision to sustain the State's objection was not arbitrary or unreasonable.

¶ 66 The trial court also sustained the State's objection to defense counsel's comment regarding the lack of burn wounds on Jones' leg. Defendant, however, contends that Dr. Milburn testified he did not notice burn marks, and the logical inference from this testimony was that Jones was shot from a distance. He argues that defense counsel may draw reasonable inferences from the evidence, and the trial court improperly prevented counsel from doing so.

¶ 67 We disagree. Opinion testimony on whether being shot from a certain distance will cause burns is generally given by experts, such as medical examiners or technicians, who are specially qualified to make such determinations. See for *e.g. People v. Williams*, 80 Ill. App. 3d 963, 966–67 (1980); *People v. LaRue*, 298 Ill. App. 3d 89, 91 (1998); *People v. Burnette*, 325 Ill. App. 3d 792, 798 (2001); *People v. Rodriguez*, 336 Ill. App. 3d 1, 7–8 (2002). Although Dr. Milburn testified that he did not recall any burn wounds on Jones' leg, he acknowledged that he was not "a ballistics expert." As such, Dr. Milburn was not qualified to give an opinion on the issue, nor did he offer one. See Ill. R. Evid. 701 (eff. Jan. 1, 2011) (providing that a non-expert witness cannot

offer opinions or inferences that are "based on scientific, technical, or other specialized knowledge").

¶ 68    The inference counsel wanted to make during closing argument was not a simple one that any person could have drawn regardless of training or experience. Without an expert opinion on whether the bullet wound indicated Jones was shot from close range, defense counsel was without evidence to support his argument. Therefore, the trial court did not abuse its discretion when it sustained the State's objection to defense counsel's comment.

¶ 69    Defendant next argues that in limiting defense counsel's remarks and granting the prosecutor wide latitude in rebuttal, the trial court improperly assumed the role of prosecutor and indicated that it favored the State. Defendant acknowledges that he forfeited this issue where he did not object to the challenged comments at trial, nor did he include the issue in his posttrial motion. See *People v. Macri*, 185 Ill. 2d 1, 65 (1998). Although defendant requests that we review his claims as plain error, the first step of plain error review is to determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 70    To support his contention that the trial court committed reversible error, defendant cites *People v. Minter*, 2015 IL App (1st) 120958. In *Minter*, the defendant was charged with armed robbery and the only issue at trial was whether his accomplice, "Breed," was armed at the time of the robbery. If so, the defendant would be liable for the firearm under an accountability theory. *Id*. ¶ 2.

¶ 71    At trial, Detective Manuel Escalante of the Harvey Police Department testified that he had arrested the defendant, and the defendant admitted that Breed was armed with a firearm. *Id*. ¶¶ 18-19. On cross-examination, Escalante stated that the defendant had given him Breed's actual first name and said that Breed "lived on 146th Street in Harvey." Escalante testified that 146th Street

"ran east to west across Harvey." *Id*. ¶ 20. Although a weapon was not recovered, Escalante maintained that he had searched for one. *Id*.

¶ 72    At trial, the defendant testified that Breed was not armed during the robbery. He explained that he had signed a written statement that Breed had a firearm because he "didn't want to get charged with any more charges that [he] had nothing to do with at all." *Id*. ¶ 17.

¶ 73    During closing argument, defense counsel attempted to argue that Escalante did not actually believe a firearm was involved. He argued that if Escalante thought Breed had used a firearm, Escalante would have recovered it because he knew Breed's real name and where he lived. *Id*. ¶ 30. The State objected and this exchange followed:

> "THE COURT: Sustained. That's not what he said.
>
> [DEFENSE COUNSEL]: He did say Breed lived on 146th Street in Harvey. That was the evidence.
>
> THE COURT: That's about two miles long.
>
> [DEFENSE COUNSEL]: It may be two miles long.
>
> THE COURT: That's what he testified to.
>
> [DEFENSE COUNSEL]: It may be two miles long, ladies and gentlemen, but Detective Escalante is not the only police officer on that force. He has a whole Harvey Police Department at his disposal."

Defense counsel argued that if the offense had been murder, Escalante would have "gone those two miles to find that gun" and "it's not out of the realm of possibility that Detective Escalante could have found this gun and found this Breed." *Id*. ¶ 128.

¶ 74    The defendant was convicted of armed robbery. On appeal, this court found that the trial court's statement that 146th Street was two miles long misstated the evidence, and the trial court

"improperly assumed a prosecutorial role in arguing with defense counsel about Detective Escalante's testimony." *Id*. ¶ 129. We further found that the court's misstatement implied that the defendant's information that Breed lived on 146th Street in Harvey was too vague for the police to actually locate Breed's residence. Thus, the trial court improperly "signaled to the jury that the evidence supporting [defense] counsel's argument was weak." *Id*. Nonetheless, we determined that the defendant forfeited the issue by failing to object to the comments at trial where the State's evidence establishing his guilt was strong. *Id*. ¶ 139.

¶ 75    Defendant contends that, like the court in *Minter*, the trial court below took a prosecutorial stance when it argued with defense counsel about Jones' black car testimony. Furthermore, the court's improper conduct "completely foreclosed" defense counsel from using that evidence to discredit Jones' account of the shooting.

¶ 76    We find *Minter* distinguishable. In that case, the trial court injected a fact not in evidence, that 146th Street in Harvey was "about two miles long," when it sustained the State's objection. By doing so, the trial court not only supported the State's position by introducing an unproven fact, but it also undermined the defense's theory of the case by indicating to the jury that the police had insufficient information to locate Breed's residence.

¶ 77    In contrast, the trial court's comment in this case, that Jones denied saying the shooter "came from a black car," was not a misstatement of the evidence. Moreover, defense counsel intended to use Jones' alleged statement to cast doubt upon Jones' credibility. Unlike *Minter*, the trial court's comments did not substantially weaken the defense's position that Jones was not a credible witness. Counsel reminded jurors in closing argument that before the shooting, Jones "was very drunk to the point where he had to go ahead and pass out on a bench." Jones acknowledged that he was drinking earlier that day. Defense counsel argued, "[s]o we know he was drunk. So his

ability to observe is compromised. His ability to remember is compromised." We find no error here.

¶ 78    Defendant also contends that the trial court favored the State by giving the prosecutor more leniency to attack Ellis' credibility during closing argument. At the same time, the trial court prevented defense counsel from fully attacking the credibility of Jones with his prior inconsistent statement regarding the black car. Again, we find no error.

¶ 79    First, defendant's argument assumes the trial court erred when it did not allow defense counsel to argue that Jones stated the shooter "came from a black car." We have already determined that the trial court properly sustained the State's objection to this comment. Second, we find that the prosecutor's comments did not exceed the bounds of proper closing argument.

¶ 80    A prosecutor "has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *People v. Williams*, 2022 IL 126918, ¶ 44. He or she may respond to comments made by defense counsel in closing argument that clearly invite a response. *People v. Munson*, 206 Ill.2d 104, 145 (2002). Additionally, it is well-established that the credibility of witnesses is a proper subject for closing argument. *People v. Richardson*, 123 Ill. 2d 322, 356 (1988).

¶ 81    At trial, the credibility of Jones and defense witness Ellis was at issue because each gave a different account of the shooting and whether defendant was present at the time. Both the prosecutor and defense counsel raised the issue in their closing argument. Defense counsel focused on the fact that Jones had been drinking prior to the shooting. He argued that Jones was drunk and his ability to observe was compromised, despite Jones' testimony that he was sober at the time of

the shooting. Counsel argued, "Mr. Jones did lie when asked if he was drunk. Why? Why would he lie? Come in here and tell the truth, right?"

¶ 82    In rebuttal, the prosecutor responded, "you heard the words come from [Ellis'] own mouth. The defendant was looking for help *** to get him out of the fact that he shot Ulysses." The prosecutor continued, "So what did [Ellis] do? He got up here to help his friend, the defendant, and that's why you can't believe [Ellis.]" The prosecutor argued that "[i]t's just important again to point out looking at [Ellis'] testimony versus [Jones], [Ellis] has every reason to come in here and lie like I said. This is his friend."

¶ 83    Defendant challenges these comments as highly improper. However, we find no error. The prosecutor was merely responding to defense counsel's argument that Jones had lied about being drunk. Defense counsel implied that Jones' other testimony, particularly his account of the shooting, also was not credible. A prosecutor may respond to defense counsel's comments in closing argument that clearly invite a response. *Munson*, 206 Ill.2d at 145; see also *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 31 (finding that it is not improper to call a witness a "liar" if conflicts in the evidence support such an assertion).

¶ 84    Since we have found no error, there can be no plain error. Accordingly, we find no basis to excuse defendant's procedural default and need not further consider his claims. See *People v. Sims*, 192 Ill. 2d 592, 624 (2000).

¶ 85                                        B. *Actual Innocence*

¶ 86    Defendant's final contention is that the trial court should have granted his motion for a new trial based on the newly discovered testimony of Tripp.[1]

---

[1]   Defendant did not raise Dennard's posttrial testimony as an issue on appeal. Therefore, we consider defendant's claim based only on Tripp's statements.

¶ 87    When a hearing is held on a posttrial motion, the trial court is the finder of fact. See *People v. Evans*, 54 Ill. App. 3d 883, 886 (1977) (finding that it was the trial court's function to determine the credibility of a witness who testified at a posttrial hearing); see also *People v. Cline*, 2022 IL 126383, ¶ 39 (determining that the trial court's finding that the fingerprint examiner was a credible witness was well within the province of the court); *People v. Carter*, 2013 IL App (2d) 110703, ¶ 82 (finding that the trial court may assess the credibility of new witnesses to determine whether the conclusive character element has been met). Where, as here, the trial court held an evidentiary hearing in which it considered new evidence and weighed the credibility of witnesses, we will overturn the trial court's determination only if it is manifestly erroneous. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). The trial court's factual finding is manifestly erroneous if the error is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Id*. In other words, "a decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98. We review the trial court's ruling on a motion for a new trial for an abuse of discretion. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 54.

¶ 88    New evidence warrants a new trial only if it is (1) newly discovered and could not have been discovered before trial with due diligence, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Molstad*, 101 Ill. 2d 128, 134 (1984). When considering an actual innocence claim, the most important element is the conclusive character of the new evidence. *People v. Robinson*, 2020 IL 123849, ¶ 47. The evidence need not be entirely dispositive to satisfy this element. *Id*. ¶ 56. Rather, the evidence must only place the trial evidence in a different light and undermine the court's confidence in defendant's guilt. *Id*.

¶ 89    Defendant argues that Tripp's testimony was of such conclusive character because he actually witnessed the shooting and identified a person other than defendant, someone known as "D" or "D-Boy," as the shooter. He argues that Tripp's testimony would have corroborated Ellis' testimony at trial that defendant was not the shooter.

¶ 90    The trial court, however, did not find Tripp's testimony credible. The court noted that in a prior statement to investigator Winters, Tripp told Winters that on June 30, 2019, he was at the gas station on Lorel when he saw a man get shot. He told Winters that the shooter was "in a little red car" and "looked to be a dark skin male." However, at the hearing on defendant's motion, Tripp described the shooter as a "light-skinned dude with dreadlocks." Tripp also testified that he was the target of the shooting. In his statement to Winters, Tripp said that he saw defendant on the night of the shooting, but defendant left the area in a SUV before the shooting occurred. At the hearing, Tripp testified that he did not see defendant at all that night. In light of these inconsistencies, the trial court found Tripp's testimony at the hearing "outrageously ridiculous. Not worth the paper it would have been written on." The trial court's finding that Tripp was not a credible witness was not against the manifest weight of the evidence.

¶ 91    When assessing the conclusive character of the new evidence, the trial court found that Tripp's testimony provided "no basis whatsoever" to grant a new trial where Jones credibly testified about the shooting. Jones testified that he and defendant got into an argument at the gas station, and the verbal altercation continued as they left the station. A video recording corroborated Jones' testimony. With unwavering certainty, Jones identified defendant as the shooter to Detective Conley on two occasions. He also identified defendant's photo from an array and told the administrating officer, "that's the guy that shot me." Jones positively identified defendant in court as the shooter.

¶ 92    The jury found Jones to be a credible witness. Although defendant raises concerns about the trial court's recollection of various testimony, the court correctly recalled Tripp's inconsistent testimony regarding his description of the shooter and whether defendant was present on the night of the shooting. The trial court found nothing in Tripp's widely disparate accounts of the shooting that would probably change the result on retrial. We do not find the trial court's determination to be arbitrary, fanciful or unreasonable. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a new trial.

¶ 93                                III. CONCLUSION

¶ 94    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 95    Affirmed.